# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
## 2014-1647

AD HOC SHRIMP TRADE ACTION COMMITTEE,

Plaintiff-Appellee,

v.

UNITED STATES

Defendant-Appellee,

and

HILLTOP INTERNATIONAL and OCEAN DUKE CORP.,

Defendants-Appellants.

Appeal from the United States Court of International Trade in
case no. 10-cv-00275, Judge Donald C. Pogue

**BRIEF OF PLAINTIFFS-APPELLANTS HILLTOP INTERNATIONAL
AND OCEAN DUKE CORP.**

**NON-CONFIDENTIAL VERSION**

Mark E. Pardo
Andrew T. Schutz

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Ave., NW
Suite 650
Washington, DC 20005
Tel: (202) 783-6881

Date: September 19, 2014

**NON-CONFIDENTIAL VERSION**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## AD HOC SHRIMP TRADE ACTION COMM. v US, 2014-1647

## CERTIFICATE OF INTEREST

Pursuant to Rule 47.4 of the Rules of the U.S. Court of Appeals for the Federal Circuit, counsel for Appellants, Hilltop International and Ocean Duke Corp., certifies the following:

1.    The full name of every party or *amicus* represented by me is:

Hilltop International and Ocean Duke Corp.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest)

Not applicable.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or *amicus curiae* represented by me are:

Not applicable.

4.    The names of all law firms and the partners or associates that have appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Mark E. Pardo and Andrew T. Schutz of the law firm Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP appeared in the trial court below and are expected to appear in this court.

Date: September 19, 2014                       /s/Mark E. Pardo
                                                Mark E. Pardo
                                                Counsel for Appellant

**NON-CONFIDENTIAL VERSION**

# TABLE OF CONTENTS

**STATEMENT OF RELATED CASES**....................................................1

**JURISDICTIONAL STATEMENT**.....................................................2

**STATEMENT OF THE ISSUES**.........................................................2

**STATEMENT OF THE CASE**.............................................................2

**SUMMARY OF ARGUMENT**...........................................................15

**ARGUMENT**.......................................................................................17

    I.     STANDARD OF REVIEW ...............................................17

    II.   COMMERCE'S DECISION TO REJECT ALL INFORMATION SUBMITTED BY HILLTOP AND RESORT TO TOTAL AFA WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE CONTRARY TO LAW .............................................18

        A.   SINCE THE INFORMATION REGARDING THE OCEAN KING AFFILIATION WAS NOT PERTINENT TO COMMERCE'S MARGIN CALCULATION IN AR 4, THERE WAS NO LEGITIMATE BASIS TO APPLY FACTS AVAILABLE OR AN ADVERSE INFERENCE FOR ITS OMISSION.....................................................19

            1.    The Statutory Requirements For Application of AFA ...19

            2.    Record Evidence From This AR And Other Precedent Confirm That Third Country Affiliates Were Not Pertinent To The Calculation Of Hilltop's Margin .......23

            3.    There Can Be No "Gap" With Respect To The Ocean King Affiliation Because Commerce Added All Information Regarding Ocean King To The AR 4 Record.......................................................................30

        B.   THE OMISSION OF OCEAN KING FROM HILLTOP'S AFFILIATION CHARTS WAS NOT "CORE" INFORMATION THAT COULD JUSTIFY APPLICATION OF TOTAL AFA.........................33

i

NON-CONFIDENTIAL VERSION

C.    IT WAS IMPROPER FOR COMMERCE TO CONSIDER
TRANSSHIPMENT OR CIRCUMVENTION ALLEGATIONS WITHIN
ITS AR 4 PROCEEDING .................................................................42

III.    IT WAS IMPROPER TO TREAT HILLTOP AS PART OF THE
PRC-WIDE ENTITY BECAUSE INDEPENDENT RECORD
EVIDENCE CONFIRMS HILLTOP IS A HONG KONG
EXPORTER EXEMPT FROM THE SEPARATE RATE TEST.......46

IV.    THE DEPARTMENT'S CORROBORATION OF THE AFA RATE
APPLIED TO HILLTOP AS PART OF THE PRC-WIDE ENTITY
WAS UNSUPPORTED BY SUBANTIAL EVIDENCE AND
CONTRARY TO LAW ....................................................................55

A.    THE CORROBORATION FRAMEWORK ...........................................55

B.    THE DEPARTMENT FAILED TO OFFER ADEQUATE AND LAWFUL
CORROBORATION FOR THE 112.81% PETITION RATE ASSIGNED
TO THE PRC-WIDE ENTITY .......................................................58

1.    The AFA Rate and Corroboration Information
Commerce Used Are Outdated and Not Relevant to the
Current Review Proceeding.............................................58

2.    Commerce Improperly Ignored the Record Evidence
of All Calculated Margins That Confirmed the
112.81% AFA Rate Was Aberrational ...........................61

3.    The Small Percentage of Sales Data Used by
Commerce Cannot Corroborate the Excessively High
AFA Margin....................................................................63

C.    THE TRIAL COURT ERRED IN CONCLUDING THAT PREVIOUS
CALCULATED RATES ARE IRRELEVANT TO THE
CORROBORATION REQUIREMENT IN THIS CASE.........................66

D.    COMMERCE UNREASONABLY DENIED ACCESS TO
INFORMATION DEMONSTRATING THE ABERRATIONAL NATURE
OF THE CHERRY-PICKED RD GARDEN DATA ..............................69

CONCLUSION.................................................................................72

**NON-CONFIDENTIAL VERSION**

CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(a)5 AND (7)

The material omitted in this non-confidential version all is, or relates to, material subject to a protective order. The material omitted on pages 14, 64, and 66 identifies business proprietary information that the U.S. Department of Commerce placed on the record of the underlying remand proceeding.  This confidential information     consists of antidumping duty margin information for a company that is not subject to this appeal.    The material omitted on page 28 is confidential sales information from Ocean Duke Corp. submitted under APO in the underlying administrative proceeding.

# TABLE OF AUTHORITIES

## Cases

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
828 F. Supp. 2d 1345 (Ct. Int'l Trade 2012) ......................................................39-40

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
925 F. Supp. 2d 1315 (Ct. Int'l Trade 2013) ....................................................*12, 58*

*Advanced Tech. & Materials Co. v. United States*,
885 F. Supp. 2d 1343 (Ct. Int'l Trade 2012) ..........................................................47

*AMS Assocs. v. United States*,
719 F.3d 1376 (Fed. Cir 2013) ...............................................................................54

*China Kingdom Import & Exp. Co. v. United States*,
31 CIT 1329 (2007) .................................................................................................54

*Decca Hospitality Furnishings, LLC v. United States*,
30 C.I.T. 357 (2006) ...............................................................................................40

*Dongbu Steel Co., Ltd. v. United States*,
635 F.3d 1363 (Fed. Cir. 2011) ..............................................................................29

*Dongguan Sunrise Furniture Co., Ltd. v. United States*,
904 F. Supp. 2d 1359 (Ct. Int'l Trade 2013) ..........................................................65

*Ferro Union, Inc. v. United States*,
23 CIT 713 (1999) ...........................................................................................*passim*

*F.Lii De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*,
216 F.3d 1027 (Fed. Cir. 2000) ..........................................................................56-57

*Foshan Shunde Yongjian Housewares & Hardware Co., v. United States*,
35 CIT __, 2011 Ct. Intl. Trade LEXIS 123 ..........................................................35

*Foshan Shunde Yongjian Housewares & Hardware Co. v. United States*,

NON-CONFIDENTIAL VERSION

991 F. Supp. 2d 1322 (Ct. Int'l Trade 2014)......................................................56, 70

*Gallant Ocean (Thail.) Co. v. United States*,
   602 F.3d 1319 (Fed. Cir. 2010) ...................................................................*passim*

*Gerald Metals, Inc. v. United States*,
   132 F.3d 716 (Fed. Cir. 1997) ...........................................................................17, 63

*Gerber Food (Yunnan) Co. v. United States*,
   29 CIT 753 (2005) ............................................................................................36-37

*Globe Metallurgical Inc. v. United States*,
   722 F. Supp. 2d 1372 (Ct. Int'l Trade 2010)....................................................43-44

*GPX Int'l Tire Corp. v. United States*,
   893 F. Supp. 2d 1296 (Ct. Int'l Trade 2013)........................................................32

*Jiangsu Changbao Steel Tube Co., Ltd. v. United States*,
   884 F. Supp. 2d 1295 (Ct Int'l. Trade 2012) ......................................................34

*Home Prods. Int'l v. United States*,
   633 F3d 1369 (Fed. Cir.2011) .............................................................................35

*Krupp Thyssen Nirosta GMBH v. United States*,
   24 CIT 666 (2000) ..............................................................................................34

*Laminated Woven Sacks Comm. v. United States*,
   716 F. Supp. 2d 1316 (Ct. Int'l Trade 2010)........................................................45

*Lifestyle Enterprise, Inc. v. United States*,
   768 F. Supp. 2d 1286 (2011) .............................................................57, 60, 68

*Lifestyle Enter. v. United States*,
   751 F.3d 1371 (Fed. Cir. 2014) ...........................................................................60

*Luoyang Bearing Corp. v. United States*,
   29 CIT 24 (2005) ................................................................................................47

*Mitsubishi Elec. Corp. v. United States*,
   16 CIT 730 (1992) ..............................................................................................45

NON-CONFIDENTIAL VERSION

*Ningbo Dafa Chem. Fiber Co. v. United States*,
    580 F.3d 1247 (Fed. Cir. 2009) .......................................................... 21

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003) .......................................................... 21

*NSK Ltd. v. United States*,
    358 F. Supp. 2d 1276 (Ct. Int'l Trade 2005) ..................................... 22

*NTN Bearing Corp. v. United States*,
    73 F.3d 1204 (Fed. Cir. 1995) ............................................................ 46

*NTN Bearing Corp. of America v. United States*,
    368 F.3d 1369 (Fed. Cir. 2004) .......................................................... 22

*PAM, S.p.A. v. United States*,
    31 CIT 1008 (2007) ....................................................................... 38-39

*Peer Bearing Co.-Changshan v. United States*,
    587 F. Supp. 2d 1319 (2008) ....................................................... 38, 68

*Qingdao Taifa Group Co. v. United States*,
    33 CIT 1090 (Ct. Intl Trade 2009) ..................................................... 35

*Qingdao Taifa Group Co. v. United States*,
    760 F. Supp. 2d 1379 (Ct. Int'l Trade 2010) ......................... 57, 65, 68

*Rhone Poulenc, Inc. v. United States*,
    899 F.2d 1185 (Fed. Cir. 1990) .......................................................... 63

*Save Domestic Oil, Inc. v. United States*,
    357 F.3d 1278 (Fed. Cir. 2004) .......................................................... 36

*Shandong Huarong Mach. Co. v. United States*,
    30 CIT 1269 (2006) .................................................................... 21, 24

*Shandong Mach. Imp. & Exp. Co. v. United States*,
    33 C.I.T. 810 (2009) ........................................................................... 68

NON-CONFIDENTIAL VERSION

*Shanghai Taoen Int'l Trading Co. v. United States*,
   29 CIT 189 (2005) ........................................................................34

*Since Hardware (Guangzhou) Co. v. United States*,
   34 CIT __, 2010 Ct. Intl. Trade LEXIS 119 ...................................35

*Ta Chen Stainless Steel Pipe Co. v. United States*,
   31 CIT 794 (2007) ...................................................................26, 29

*Taian Ziyang Food Co. v. United States*,
   783 F. Supp. 2d 1292 (Ct. Int'l Trade 2011) ...................................38

*Timken Co. v. United States*,
   354 F.3d 1334 (Fed. Cir. 2004) ......................................................57

*Tokyo Kikai Seisakushu Ltd. v. United States*,
   529 F.3d 1352 (Fed. Cir. 2008) ......................................................35

Thai Pineapple Canning Industry Corp. v. United States,
   273 F.3d 1077 (Fed. Cir. 2001) ..................................................17-18

*Washington Int'l Ins. Co. v. United States*,
   2010 Ct. Intl. Trade LEXIS 13 (2010).............................................70

*Zhejiang Dunan Hetian Metal Co. v. United States*,
   652 F.3d 1333 (Fed. Cir. 2011) ...................................21, 23, 33, 36

## Statutes and Regulations

19 U.S.C. § 1516a (b)(1)(B)(i).................................................................17

19 U.S.C. § 1675(a) ....................................................................42, 46

19 U.S.C. § 1675b(c) ..........................................................................68

19 U.S.C. § 1677(33) ..........................................................................10

19 U.S.C. § 1677e(a).....................................................................*passim*

NON-CONFIDENTIAL VERSION

19 U.S.C. § 1677e(b) ...........................................................................*passim*

19 U.S.C. 1677e(c)..................................................................11, 55, 67-68

19 U.S.C. § 1677j ...............................................................................42, 44

19 U.S.C. § 1677j(d) ...................................................................................45

19 U.S.C. § 1677m(e) .......................................................................*passim*

19 U.S.C. § 3538(b) ....................................................................................12

28 U.S.C. § 1295(a)(5) ..................................................................................2

28 U.S.C. § 1581(c) ......................................................................................2

28 U.S.C. § 2107(b) ......................................................................................2

19 C.F.R. § 351.222(b) .................................................................................9

19 C.F.R. § 351.225(j) ................................................................................45

19 C.F.R. § 351.308(c)(1) ...........................................................................55

19 C.F.R. § 351.308(d) ...............................................................................71

## Administrative Decisions

*Administrative Review of Certain Frozen Warmwater Shrimp From the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 75 Fed. Reg. 49460 (August 13, 2010) ........................4

*Application of U.S. Antidumping and Countervailing Duty Laws to Hong Kong*, 62 Fed. Reg. 42965 (Dep't of Commerce Aug. 11, 1997). ....................................49

*Certain Activated Carbon From the People's Republic of China: Preliminary Results of the Third Antidumping Duty Administrative Review, and Preliminary Rescission in Part,* 76 Fed. Reg. 23,978 (April 29, 2011) ................................42-43

NON-CONFIDENTIAL VERSION

*Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses From the People's Republic of China: Notice of Preliminary Determination of Sales at Less Than Fair Value*, 75 Fed. Reg. 24,892 (May 6, 2010) ........................................................................................48

*Certain Frozen Warmwater Shrimp from the People's Republic of China: Final Results, Partial Rescission of Sixth Antidumping Duty Administrative Review and Determination Not to Revoke in Part,* 77 Fed. Reg. 53,856 (September 4, 2012) ........................................................................................10

*Certain Frozen Warmwater Shrimp From the People's Republic of China and Diamond Sawblades and Parts Thereof From the People's Republic of China: Notice of Implementation of Determinations Under Section 129 of the Uruguay Round Agreements Act and Partial Revocation of the Antidumping Duty Orders*, 78 Fed. Reg. 18,958 (March 28, 2013) ...............................................12, 61, 64

*Certain Kitchen Appliance Shelving and Racks From the People's Republic of China: Final Results and Partial Rescission of First Antidumping Duty Administrative Review*, 77 Fed. Reg.  21,734 (April 11, 2012) ........................43

*Certain Stainless Steel Butt-Weld Pipe Fittings From Taiwan,* 70 Fed. Reg. 1870 (January 11, 2005) ..............................................................................24-25

*De Facto Criteria for Establishing a Separate Rate in Antidumping Proceedings Involving Non-Market Economy Countries*, 78 Fed. Reg. 40,430 (July 5, 2013) .......................................................................................49-50

*Final Determination of Sales at Less Than Fair Value: Silicon Carbide from the People's Republic of China,* 59 Fed. Reg. 22585 (May 2, 1994) ......................47

*Final Determination of Sales at Less Than Fair Value: Sparklers from the People's Republic of China, 56 Fed. Reg. 20588* (May 6, 1991).....................................47

*Fourth Administrative Review of Certain Frozen Warmwater Shrimp from the People's Republic of China: Preliminary Results, Preliminary Partial Rescission of Antidumping Duty Administrative Review, and Intent Not To Revoke, In Part*, 75 Fed. Reg. 11,855 (Mar. 12, 2010) ........................................*3-4*

NON-CONFIDENTIAL VERSION

*Fresh Garlic From the People's Republic of China: Preliminary Results of New Shipper Review of Shijiazhuang Goodman Trading Co.,* Ltd., 78 Fed. Reg. 67,112 (November 8, 2013)................................................................48

*Laminated Woven Sacks From the People's Republic of China: Negative Final Determination of Circumvention*, 78 Fed. Reg. 12,716 (February 25, 2013) ....42

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Preliminary Results of Antidumping Administrative Review and Intent To Revoke Antidumping Duty Order in Part*, 61 Fed. Reg. 40,610 (August 5, 1996) ....................................................................48

*Third Administrative Review of Frozen Warmwater Shrimp From the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 74 Fed. Reg. 46,565 (September 10, 2009).................61

## Others
Statement of Administrative Action ("SAA"), H.R. Rep. No. 103-316, at 869, *reprinted in* 1994 U.S.C.C.A.N. at 4198-99...............................................*passim*

**NON-CONFIDENTIAL VERSION**

## STATEMENT OF RELATED CASES

In accordance with Rule 47.5 of the Rules of the U.S. Court of Appeals for the Federal Circuit, counsel for Plaintiffs-Appellants Hilltop International and Ocean Duke Corp. (collectively, "Hilltop") states:

1.      Counsel is not aware of there any other appeal in or from the same civil action or proceeding in the lower court or body was previously before this or any other appellate court.

2.      This case is currently designated as a companion case to *Ad Hoc Shrimp Trade Action Committee v. United States*, 14-1514.   The United States requested voluntary remands in both cases to place the same information from subsequent administrative reviews of the frozen warmwater shrimp from China antidumping duty order indicating that Hilltop may have made misrepresentations in the administrative reviews that were the subject of these two appeals.  The U.S. Department of Commerce ("Commerce" or the "Department") then used this information to justify the application of total adverse facts available ("AFA") to Hilltop in both remand proceedings.  The use of that information and the Department's AFA determination as a result is the subject of both appeals before this Court.

The use of this information in later administrative reviews against Hilltop is also the subject of two appeals before the Court of International Trade ("CIT" or

**NON-CONFIDENTIAL VERSION**

"trial court"), Court Nos. 12-289 and 13-358, which are currently stayed pending the outcome of Court Nos. 14-1647 and 14-1514.

## JURISDICTIONAL STATEMENT

The CIT had exclusive subject matter jurisdiction over this action under 28 U.S.C. § 1581(c). The U.S. Court of Appeals for the Federal Circuit has exclusive jurisdiction over this appeal under 28 U.S.C. § 1295(a)(5). This appeal was timely filed on July 18, 2014, *i.e.*, within 60 days of the CIT's final opinion and judgment of May 20, 2014. 28 U.S.C. § 2107(b); Fed. R. App. P. 4(a)(1)(B).

## STATEMENT OF THE ISSUES

(1)    Whether the Department lawfully rejected all information submitted by Hilltop International and included the company in the China-wide entity in light of certain alleged misrepresentations regarding third party affiliates; and

(2)    Whether the Department's corroboration of the adverse facts available rate applied to Hilltop was reasonable or otherwise in accordance with law.

## STATEMENT OF THE CASE

This appeal is a challenge of the U.S. Department of Commerce's ("Commerce" or "the Department") final redetermination on remand of the fourth administrative review ("AR 4") of the antidumping duty order covering Certain Frozen Warmwater Shrimp from the People's Republic of China.

2

**NON-CONFIDENTIAL VERSION**

<u>The AR 4 Review</u>

On March 26, 2009, Commerce published its initiation of AR 4.  This review covered entries of subject shrimp made between February 1, 2008 and January 31, 2009.  Commerce selected Hilltop International ("Hilltop") as one of two mandatory respondents in AR 4.

On July 6, 2009, Hilltop submitted its response to Section A of the AR 4 antidumping questionnaire.[1]  This response informed Commerce that all sales during AR 4 to the United States were made through Hilltop's U.S. affiliate, Ocean Duke.  Hilltop Section A Response at 1 (July 6, 2009) (**JA0000084**).  The Section A Response also provided a narrative discussion of all the Hilltop affiliates involved in the production or sale of subject merchandise, and it included as Exhibit A-2 a chart of all Hilltop affiliates, including third country affiliates.  *Id*. at 15-20 and Exh. A-2 (**JA000098-98f, JA0000129-132**).  The Section A Response also confirmed that Hilltop was located in Hong Kong, and it provided copies of Hilltop's Hong Kong Business Registration and Hong Kong Business License.  *Id*. at Exs A-5 and A-6 (**JA00000099-JA0000132**).

On March 12, 2010, Commerce published the preliminary results for AR 4. *Fourth Administrative Review of Certain Frozen Warmwater Shrimp from the*

---

[1] Antidumping questionnaires are divided into lettered sections:  Section A provides general corporate information, Section B provides home market sales data, section C provides U.S. sales data and Section D provides production data.

NON-CONFIDENTIAL VERSION

*People's Republic of China: Preliminary Results, Preliminary Partial Rescission of Antidumping Duty Administrative Review, and Intent Not To Revoke, In Part*, 75 Fed. Reg. 11,855 (Mar. 12, 2010) ("Preliminary Results").  As part of its Preliminary Results, Commerce found that Hilltop was independent from the PRC Government and entitled to receive its own "separate rate" dumping margin in this review.  *Id*. at 11,859 (**JA0000297**).   Commerce also found that Hilltop had a *de minimis* dumping margin based on the calculations it had performed using Hilltop's reported sales and production data.

On August 13, 2010, Commerce published the final results for AR 4. *Administrative Review of Certain Frozen Warmwater Shrimp From the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 75 Fed. Reg. 49460 (August 13, 2010) ("Final Results"). Commerce made no change to its preliminary decision that Hilltop was entitled to its own independent dumping margin, and Commerce continued to find Hilltop's margin to be *de minimis*. *Id*. at 49,463 (**JA0000312**).

<u>The AR 4 Appeal</u>

On September 10, 2010, Ad Hoc Shrimp Trade Action Committee ("Petitioner" or "AHSTAC") filed an appeal of AR 4 in the U.S. Court of International Trade ("CIT") challenging Commerce's findings with respect to its

selection of mandatory respondents and its valuation of packing tape. AHSTAC

Complaint (Sept. 10, 2010) (**JA0000346-JA0000350**).

On March 20, 2012, after considering a remand redetermination regarding

the selection of mandatory respondents, the CIT issued an opinion sustaining all of

Commerce's findings.  Slip Op. 12-36 (**JA0000351-JA0000375**).  On December

18, 2012, the Government filed a partial consent motion in the Federal Circuit

appeal of the AR 4 decision (Case No. 2012-1416) seeking a voluntary remand to

consider an issue unrelated to the AHSTAC appeal.  Specifically, the Government

requested a remand to reconsider the final margin for Hilltop in light of allegations

arising from recently concluded sixth administrative review ("AR 6") that Hilltop

had provided false or incomplete information regarding its affiliates.  On May 24,

2013, this Court granted the Government's motion for voluntary remand and then

issued a mandate in Case 12-1416.  On July 19, 2013, the trial court issued an

order remanding the AR 4 proceeding to Commerce pursuant to this Court's

mandate in 12-1416.  Slip Op. 13-89 (**JA0000381-JA0000383**).  On September 6,

2013, the CIT further granted a motion to extend the due date of the voluntary

remand until October 17, 2013.  On October 18, 2013, by subsequent order, this

deadline was extended once again to November 4, 2013.

On August 5, 2013, Commerce issued a File Memo in the AR 4 Remand

record in which it added numerous filings made in AR 6 regarding the allegations

NON-CONFIDENTIAL VERSION

of Hilltop's undisclosed affiliate to the AR 4 record.  DOC Memo to File Placing

Documents on the Record of the Fourth Administrative Review (**JA0000387-389,**

**JA0002337-2338**)[2].

The AR 6 Material

Hilltop had also been selected as a mandatory respondent in AR 6, and it had

received another *de minimis* result in the preliminary results on March 2, 2012.  On

March 12, 2012, AHSTAC filed a one thousand-page submission in that review

asking Commerce to investigate an alleged circumvention scheme by Ocean Duke

and other Hilltop affiliates which AHSTAC claimed had occurred during first and

second administrative reviews ("AR 1" and "AR 2") between May 2004 and July

2005.  AHSTAC AR 6 Comments on the Department's Preliminary Determination

to Grant Hilltop's Request for Company-Specific Revocation Pursuant to 19

C.F.R. § 351.222(b)(2) and Comments in Anticipation of Hilltop's Forthcoming

Verification (March 12, 2012) (**JA0000390-413**).  Much of the supporting

materials AHSTAC provided in this submission were obtained from the public

record of a criminal investigation against Mr. Lin (a principal of Hilltop's U.S.

affiliate, Ocean Duke) and other entities in 2006.  In or about March 2011, Mr. Lin

and the government executed a written plea agreement that required Mr. Lin to

---

[2] The Department placed two File Memos on the record containing this information.  One Memo contained BPI documents and the other contained Public documents.

NON-CONFIDENTIAL VERSION

enter a plea of guilty to two misdemeanor counts with respect to the misbranding of *pangasius* (a type of fish, not shrimp) between July 2005 and February 2006 as a consequence of using brand names that contained the word "grouper."  This plea agreement was the culmination of a five-year long international investigation by the U.S. government.  No charges were ever brought against Mr. Lin (or any other individual or entity) for any offense involving antidumping duty evasion on shrimp or fish fillets.

As part of the standard sentencing process for Mr. Lin after his plea agreement, both the government and the defense were entitled to supply the U.S. Probation Office with a "Sentencing Report" containing materials that each party believed should be considered for sentencing.  As part of its Sentencing Report, the government attempted to convince the Probation Office that Mr. Lin should be held responsible not only for the allegations that were the subject of the plea agreement, but also with respect to uncharged allegations involving the transshipment of shrimp.  To support its position, the government culled together selected materials from its five-year investigation of Ocean Duke and other entities.[3]   Included in these materials (and in the AHSTAC submission to

---

[3] The Sentencing Report was <u>not</u> a finding by the court with respect to the circumvention of shrimp.  It was merely a series of unproven allegations advanced by the government in an effort to seek a more punitive sentence against Mr. Lin for the inaccurate labeling misdemeanor offenses. Significantly, the Probation Department and District Court Judge Anderson of the U.S. District Court for the

NON-CONFIDENTIAL VERSION

Commerce) were emails from 2004 between Ocean Duke personnel and others purporting to discuss the establishment of a Cambodian shrimp processing factory and the movement of shrimp from Vietnam to Cambodia.  Attachment 19 of Sentencing Report (**JA0001159-1160**).

On May 17, 2012, in response to AHSTAC's submission, Commerce placed on the AR 6 record U.S. Customs and Board Protection ("CBP") import data for shrimp from Cambodia to the United States. DOC AR 6 Memo To File, Customs Data of U.S. Imports of Certain Frozen Warmwater Shrimp from Cambodia (May 17, 2012) (**JA0003298-3311**).  On May 24, 2012, Hilltop submitted comments on this CBP import data, noting that it plainly showed that there were no imports of shrimp from Cambodia to the US whatsoever in ARs 4, 5 or 6. Hilltop's AR 6 Response to CBP Import Data (May 24, 2012) (**JA0003387-3397**).

In further response to the AHSTAC submission, Commerce issued Hilltop a supplemental questionnaire seeking additional information related to these allegations of transshipment in ARs 1 and 2.  Hilltop filed a response, arguing in part that there was no valid basis to be making inquiries of allegations regarding AR 1 and AR 2 activities in the context of the AR 6 proceeding, and that it was

---

Central District of California were not persuaded by the "evidence" offered by the government, and the mislabeling infraction for which Mr. Lin plead guilty resulted in a sentence of probation and a fine.  *See* Hilltop's AR 6 Response to Petitioner's March 12, 2012 Filing at pp. 2-10 and Attachment 2 (**JA0001395-1403, JA0001429-1484**).

improper for Commerce to investigate allegations of transshipment in the context of an administrative dumping review.  Hilltop AR 6 Response to June 1, 2012 Supplemental Questionnaire at 1-9 (June 15, 2012) (**JA0003605-3618**).  Hilltop provided information in response to Commerce's questions with respect to ARs 4, 5 and 6, but declined to answer questions from earlier periods, citing Commerce's prior statements that any earlier activity would not be relevant to the AR 6 proceeding.[4]  *Id.* at 9-14 (**JA0003618-3623**).  As part of its responses, Hilltop did state that it had no affiliation with any Cambodian company in ARs 4, 5 or 6.  *Id*.

On June 19, 2012, Commerce issued another Memo to the File submitting public registration documents for Ocean King (Cambodia), a Cambodian shrimp processor.  These documents listed one of Hilltop's owners, Mr. To, as a board member of Ocean King until September 28, 2010.  DOC AR 6 Memo to File, Public Registration Documents for Ocean King (Cambodia) Co., Ltd. (June 19, 2012) (**JA0001996-2004**).   Commerce subsequently issued Hilltop another supplemental in which it asked Hilltop to reconcile its prior responses that it had no affiliation with any Cambodian companies with these registration documents.  On June 27, 2012, Hilltop filed a timely response to this supplemental in which it acknowledged that its prior statements had been in error and acknowledging that

---

[4]  Information regarding ARs 4, 5 and 6 were relevant to the AR 6 proceeding because Hilltop had received a *de minimis* or zero margin in ARs 4 and 5 and was seeking a three-zero revocation from the AD Order in AR 6.  *See* 19 C.F.R. § 351.222(b).

NON-CONFIDENTIAL VERSION

Hilltop was affiliated with Ocean King within the meaning of 19 U.S.C. § 1677(33) until September 28, 2010 (approximately half way through AR 6).  In response to Commerce's other questions soliciting additional documentation regarding Ocean King, Hilltop engaged a local Cambodian firm to obtain over 90 pages of corporate documents regarding Ocean King.  Hilltop POR 6 Seventh Supplemental Response at 1-3 and Exh. 1 (June 27, 2012) (**JA0003693-3704, JA0003706-3757**).  One fact demonstrated by this documentation was that Ocean King had been established in July of 2005.  *Id*. at Exh. 1 (**JA0003706-3757**).

On September 4, 2012, Commerce published its final results for AR 6, revising Hilltop's antidumping margin from 0% to 112.81% based on total adverse facts available.[5]   Commerce determined that Hilltop's failure to report the affiliation with Ocean King earlier rendered all information submitted by Hilltop unreliable.  Consequently, Commerce determined that Hilltop had failed to rebut the presumption that it was part of the PRC-wide entity and assigned Hilltop the 112.81% adverse facts available ("AFA") rate previously given to the PRC-wide entity.  AR 6 I&D Memo at p. 7 (**JA0002261**).

---

[5] *Certain Frozen Warmwater Shrimp from the People's Republic of China: Final Results, Partial Rescission of Sixth Antidumping Duty Administrative Review and Determination Not to Revoke in Part,* 77 Fed. Reg. 53,856 (September 4, 2012) and accompanying Issues and Decision Memo ("AR 6 I&D Memo").

NON-CONFIDENTIAL VERSION

AR 4 Voluntary Remand Redetermination
and the CIT Decision

On the basis of the AR 6 information discussed above, Commerce

determined in its remand redetermination that Hilltop "provided false and

incomplete information regarding its affiliates in the fourth administrative review"

due to its omission of Ocean King from its list of third country affiliates in its

original AR 4 submissions.  DOC Results of Redetermination Pursuant to Court

Order at 2 (November 4, 2013) (**JA0004034**) (hereinafter "Remand").  Commerce

further determined that the omission of Ocean King from Hilltop's list of affiliates

rendered all other information submitted by Hilltop unreliable, and it consequently

found that Hilltop had not rebutted the presumption that it was part of the PRC-

wide entity.  *Id*.   As a result, Hilltop's 0.00% margin was changed to the total

adverse facts available ("AFA") rate of 112.81% that had been assigned to the

PRC-wide entity.  *Id*.

The 112.81% AFA margin was a margin alleged in the original AD

investigation petition.  By the time that Commerce issued its Remand

Redetermination in the AR 4 appeal, the CIT had already found Commerce's

original efforts to corroborate this 112.81% margin unacceptable in the AR 5

appeal and had instructed Commerce to "either adequately corroborate the 112.81

percent PRC-wide rate and explain how its corroboration satisfies the requirements

of 19 U.S.C. 1677e(c), or calculate or chose a different countrywide rate that better

NON-CONFIDENTIAL VERSION

reflects commercial reality, as supported by substantial evidence." *Ad Hoc Shrimp Trade Action Comm. v. United States*, 925 F. Supp. 2d 1315, 1327 (Ct. Int'l Trade 2013).

In an attempt to corroborate this AFA rate for AR 4, Commerce had placed certain information on the AR 4 record from the original antidumping duty investigation and the Section 129 Proceeding that had followed China's appeal of the original investigation to the WTO Dispute Settlement Body.[6]  Memorandum to File, Placing Documents on the Record of the Fourth Administrative Review (August 5, 2013) at Attachment II (**JA0003884, JA0003944-3946**).  Among other things, this information contained CONNUM-specific margin data for the mandatory respondent Shantou Red Garden Foodstuff Co., Ltd. ("Red Garden") from the original investigation, as recalculated pursuant to the Section 129 Determination.  *Id*.  Red Garden received a 0.00% margin in the Section 129 Determination and the AD order was revoked as to this company.  *See* Section 129 Determination, 78 Fed. Reg at 18,959.

---

[6] "Section 129" refers to proceedings undertaken in response to a decision by the World Trade Organization's Dispute Settlement Body that a determination by a U.S. trade agency was not consistent with the United States' obligations as a Member of the WTO's Antidumping and/or Subsidies and Countervailing Measures Agreements. *See* 19 U.S.C. § 3538(b).   The Section 129 determination at issue here is *Certain Frozen Warmwater Shrimp From the People's Republic of China and Diamond Sawblades and Parts Thereof From the People's Republic of China: Notice of Implementation of Determinations Under Section 129 of the Uruguay Round Agreements Act and Partial Revocation of the Antidumping Duty Orders*, 78 Fed. Reg. 18,958 (March 28, 2013) ("Section 129 Determination").

NON-CONFIDENTIAL VERSION

On August 9, 2013, Hilltop provided comments on this new information,
requesting that the Department place on the record all margin information from all
mandatory respondents involved in the Section 129 Determination (Allied Pacific
Group, Yelin HK., and Red Garden) rather than only select information from Red
Garden. *See* Hilltop Comments on New Information (Aug. 9, 2013) (**JA0003941-
JA0003961**). In response to Hilltop's comments, the Department placed additional
information for Red Garden from the 129 Determination on the record on August
14, 2013, but refused to place information regarding the margin calculations for
Allied Pacific Group or Yelin HK. *See* Memo to File, Placing Section 129
Documents on the Record of the Fourth Administrative Review (Aug. 14, 2014)
(**JA0003963-3966**). The Department also declined to place on the record all
disclosure materials for Red Garden, which would include transaction-specific
margin data. On August 16, 2013, Hilltop again submitted comments arguing that
this new information was deficient and should have included margin data from the
other respondents. *See* Hilltop Comments on Additional Information (Aug. 16,
2014) (**JA0004016-JA0004024**).

On September 26, 2013, as part of its draft remand redetermination,
Commerce issued another File Memo with an analysis of the Red Garden data
from the 129 Proceeding. Business Proprietary Memo for Red Garden (September
26, 2013) (**JA0004025-JA0004031**). Despite the fact that Red Garden received a

**NON-CONFIDENTIAL VERSION**

0.00% antidumping margin, the Department noted that [7] of the [101] CONNUMs for Red Garden, accounting for [2.24%] of its sales data, had margins at or above the 112.81% AFA rate. *Id*. at 2.  The Department found this [2.24%] volume in excess of the 112% margin rate to represent a "significant volume" and determined that it offered sufficient corroboration for the continued use of the 112.81% AFA margin. *Id*.

In its Final Remand, Commerce continued to find that the Red Garden data from the 129 Proceeding adequately corroborated the 112.81% AFA rate from the petition, concluding that "the Petition rate continues to be relevant to this investigation, even after taking into account subsequent changes to the original calculations pursuant to litigation, and the rate to be corroborated for purposes of this final remand." Remand at 34 (**JA0004066**).

Hilltop argued before the trial court that Commerce's remand determination should not be sustained in part because (1) there was no basis to reject all of Hilltop's reported data due to the failure to report a third country affiliate, (2) it was improper to treat Hilltop as part of the PRC wide entity because Commerce's established policy automatically grants exporters located in Hong Kong with separate rate status and (3) the 112.81% AFA rate taken from the original petition was improper because it was aberrational and Commerce had failed to provide adequate corroboration for this margin.  Defendant-Intervenors' Comments in

NON-CONFIDENTIAL VERSION

Opposition to Final Remand Results (November 22, 2013) (**JA0004158-JA0004166**).

On May 20, 2014, the trial court affirmed Commerce's Remand Redetermination rejecting all of Hilltop's reported data and treating Hilltop as part of the PRC-wide entity and the use of the Red Garden data to corroborate the 112.81% AFA margin applied to the PRC-wide entity, including Hilltop. Slip Op. 14-55 (**JA0000036-53**).

## SUMMARY OF ARGUMENT

1.      Hilltop's failure to mention Ocean King, a Cambodian shrimp processor, in its Section A affiliation chart in AR 4 does not justify Commerce's decision to disregard all information submitted by Hilltop and to treat Hilltop as part of the PRC-wide entity as total AFA. The record confirms that Ocean King was not involved in any way with the production or sale of subject merchandise during the POR, so information regarding Ocean King was not pertinent to Commerce's AR 4 margin determination. Both Commerce and the courts have previously found that there is no valid basis for applying an adverse inference against a respondent who fails to report an affiliate that is not involved in the production or sale of subject merchandise. It is also improper for Commerce to treat the failure to mention Ocean King as the omission of "core" data that would justify the rejection of all of Hilltop's reported information. Commerce's decision

**NON-CONFIDENTIAL VERSION**

to do so violates the plain language of the statute and numerous court decisions clarifying the limits of Commerce's authority to resort to facts otherwise available and adverse inferences.

2.    Commerce's decision to treat Hilltop as part of the PRC-wide entity would be improper under any circumstances because the record contains independent information confirming that Hilltop is a Hong Kong based exporter that is exempt from Commerce's separate rate analysis for non-market economy exporters.  This independent information demonstrating that Hilltop is a Hong Kong based exporter, its Hong Kong Business License and Hong Kong Business Registration, were timely filed and satisfy all other requirements of 19 U.S.C. § 1677m(e).  Thus, as a matter of law, Commerce could not decline to consider this information.

3.    The application of a 112.81% margin to Hilltop as part of the PRC-wide entity was also improper.  Commerce failed to demonstrate how this rate remains lawfully corroborated in AR 4 given the history of margins in over the life of this order below 10%.  Instead of using data contemporaneous to this review, the Department used outdated data from the investigation in an attempt to corroborate this 112.81% rate from the original antidumping duty petition.  Consequently, this rate fails to reflect commercial reality for the Chinese shrimp industry during AR 4 and cannot be used as AFA for the PRC-wide entity.

# ARGUMENT

## I.    STANDARD OF REVIEW

When reviewing antidumping determinations made by Commerce, "{the Federal Circuit} applies anew the standard of review applied by the Court of International Trade in its review of the administrative record. . . . In doing so, {the Court will} uphold Commerce's determination unless it is unsupported by Substantial evidence on the record, or otherwise not in accordance with law.  19 U.S.C. § 1516a (b)(1)(B)(i) (1994)." *F.Lii De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1031 (Fed. Cir. 2000). "{T}he substantial evidence standard requires more than mere assertion of  evidence which in and of itself justified the . . . determination, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn. . . . Rather {t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight. . . . In sum, the question before this court on review is whether "the administrative record contains substantial evidence to support the determination and was it a rational decision?" *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (internal citations deleted).

"{S}tatutory interpretations articulated by Commerce in antidumping determinations qualify for Chevron deference;" however, "if the Government's position is unreasonable, deference does the agency no good." *Thai Pineapple*

*Canning Industry Corp. v. United States*, 273 F.3d 1077, 1083 (Fed. Cir. 2001).

"While various methodologies are permitted by the statute, it is possible for the application of a particular methodology to be unreasonable in a given case when a more accurate methodology is available and has been used in similar cases." *Id.*

## II.    COMMERCE'S DECISION TO REJECT ALL INFORMATION SUBMITTED BY HILLTOP AND RESORT TO TOTAL AFA WAS UNSUPPORTED BY SUBSTANTIAL EVIDENCE AND OTHERWISE CONTRARY TO LAW

Commerce's decision in its Remand to reject all of Hilltop's reported data and to treat Hilltop as part of the PRC-wide entity as total adverse facts available ("AFA") is predicated upon a single finding: that Hilltop had omitted in its AR 4 questionnaire responses to report an affiliation with Ocean King (Cambodia) Co., Ltd. ("Ocean King"), a Cambodian shrimp processor.  Commerce offered the following explanation to support its decision to reject all of Hilltop's reported data due to this omission:

> {W}e have reconsidered our determination, taking into account record evidence obtained over the course of the subsequent sixth administrative review ("AR 6") of this proceeding, and determined that Hilltop International ("Hilltop") provided false and incomplete information regarding its affiliates in fourth administrative review ("AR 4") of this proceeding.  Because we cannot determine whether any other misrepresentations exist on the record with regard to Hilltop's full universe of affiliates, corporate structure and sales process, or whether other information may be missing from the record, we are unable to rely upon any of Hilltop's submissions in this segment. Accordingly, Hilltop has failed to rebut the presumption that it is part of the People's Republic of China ("PRC")-wide entity.

18

Remand at 2 (**JA0004033-4034**).  Commerce's determination is unsupported by substantial evidence and contrary to law.

Significantly, the CBP entry data on the record shows that during AR 4 there were <u>no imports</u> into the U.S. of shrimp from Cambodia.  Cambodia Data File (**JA0003298-3311**).   Also, as detailed below, record shows that Hilltop and its U.S. affiliate made only a de minimis quantity of sales of Cambodian origin shrimp during AR 4.  On the basis of this record evidence, Commerce's decision to apply total AFA to all of Hilltop's reported data in AR 4, and its decision to consider Hilltop part of the China-wide entity, cannot be sustained.

> **A.    SINCE THE INFORMATION REGARDING THE OCEAN KING AFFILIATION WAS NOT PERTINENT TO COMMERCE'S MARGIN CALCULATION IN AR 4, THERE WAS NO LEGITIMATE BASIS TO APPLY FACTS AVAILABLE OR AN ADVERSE INFERENCE FOR ITS OMISSION**

> **1.    The Statutory Requirements For Application of AFA**

The statutory provisions for application of facts otherwise available and for application of adverse inferences are separate but related.  19 U.S.C. § 1677e(a) governs the use of facts otherwise available and states as follows:

> (a) In general

> If-
> (1) necessary information is not available on the record, or
> (2) an interested party or any other person-

(A) withholds information that has been requested by the administering authority or the Commission under this subtitle,

(B) fails to provide such information by the deadlines for submission of the information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m of this title,

(C) significantly impedes a proceeding under this subtitle, or

(D) provides such information but the information cannot be verified as provided in section 1677m(i) of this title, the administering authority and the Commission shall, subject to section 1677m(d) of this title, use the facts otherwise available in reaching the applicable determination under this subtitle.

The use of adverse inferences is governed by 19 U.S.C. § 1677e(b), and provides as follows:

(b) Adverse inferences. If the administering authority or the Commission (as the case may be) finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the administering authority or the Commission, the administering authority or the Commission (as the case may be), in reaching the applicable determination under this title, may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available. Such adverse inference may include reliance on information derived from—

(1) the petition,
(2) a final determination in the investigation under this title,
(3) any previous review under section 1675 of this title or determination under section 1675b of this title, or
(4) any other information placed on the record.

NON-CONFIDENTIAL VERSION

While these two provisions require separate findings, they are related

because a prerequisite for the use of any adverse inference is the requirement that it

must first be appropriate to use facts otherwise available. *See, e.g.*, *Shandong*

*Huarong Mach. Co. v. United States*, 30 CIT 1269, 1301 (2006) ("Absent a valid

decision to use facts otherwise available, Commerce may not use an adverse

inference"). Furthermore, this Court and the CIT have repeatedly stated that the

use of facts otherwise available is only appropriate to "fill gaps" in the record of

missing information required for the Department to complete its antidumping duty

calculation. *See, e.g.*, *Zhejiang Dunan Hetian Metal Co. v. United States*, 652 F.3d

1333, 1348 (Fed. Cir. 2011) (confirming that the statute only authorizes Commerce

to use facts otherwise available to fill gaps in the record and that it cannot do so in

disregard of information that is not deficient or missing); *Nippon Steel Corp. v.*

*United States,* 337 F.3d 1373, 1381 (Fed. Cir. 2003) (stating that the use of facts

otherwise available is to "fill in the gaps" when "Commerce has received less than

the full and complete facts needed to make a determination"); *Ningbo Dafa Chem.*

*Fiber Co. v. United States*, 580 F.3d 1247, 1255 (Fed. Cir. 2009**)** (noting that

"{t}he legislative history of the URAA thus reveals that Congress intended §

1677e(a) to provide Commerce with gap-filling power to facilitate its

implementation of the antidumping laws").

NON-CONFIDENTIAL VERSION

The intended purpose of section 1677e(a) is further confirmed from explicit language within the legislative history.  The Statement of Administrative Action for the implementation of the Uruguay Round Antidumping Agreement (hereinafter "SAA") includes the following discussion about the use of facts otherwise available:

> New section 776(a) requires Commerce or the Commission to make determinations on the basis of facts available where requested information is missing from the record or cannot be used because, for example, it has not been provided, it was provided late, or Commerce could not verify the information.  … The agencies will be required, consistent with new section 782(e) to consider information requested from interested parties that: (1) is on the record; (2) was filed within the applicable deadlines; and (3) can be verified. … Section 776(a) generally will require Commerce to reach a determination by filling gaps in the record due to deficient submissions or other causes.[7]

Thus, the prerequisite for the use of facts otherwise available pursuant to section 1677e(a) is a "gap" on the record resulting from missing information.  *Id*.; *see also NTN Bearing Corp. of America v. United States*, 368 F.3d 1369, 1377 (Fed. Cir. 2004) (noting that the"post-1994 version of the statute permits the use of facts available when necessary information is not available on the record"); *NSK Ltd. v. United States*, 358 F. Supp. 2d 1276, 1290 (Ct. Int'l Trade 2005) (noting that,

---

[7] Statement of Administrative Action ("SAA"), H.R. Rep. No. 103-316, at 869, *reprinted in* 1994 U.S.C.C.A.N. at 4198-99.

NON-CONFIDENTIAL VERSION

"{b}y its nature, a 'facts available' analysis necessarily implies that Commerce used facts where the actual facts are an insufficient basis for a complete analysis").

As the analysis above shows, the threshold question in considering the application of an adverse inference is whether there is a "gap" in the record that must be filled using facts otherwise available.  Absent such a "gap" in the record, the Department lacks the authority to apply facts otherwise available pursuant to section 1677e(a) or any adverse inference under section 1677e(b).  *See Zhejiang Dunan,* 652 F.3d at 1348 (stating that "under the plain language of § 1677e(a), it is clear that Commerce can only use facts otherwise available to fill a gap in the record").

 In this instance, Commerce has failed to establish how Hilltop's omission of Ocean King from its list of third country affiliates in its initial AR 4 submissions has caused a "gap" of necessary information in the record.  To the contrary, the record shows that this information was not at all pertinent to Hilltop's AR 4 dumping margin calculation or to the separate rate analysis for Hilltop.

**2.    Record Evidence From This AR And Other Precedent Confirm That Third Country Affiliates Were Not Pertinent To The Calculation Of Hilltop's Margin**

It is Commerce's contention that Hilltop's omission of Ocean King from its list of third country affiliates during AR 4 resulted in Commerce being deprived of necessary information required to make a proper determination of Hilltop's

dumping margin for AR 4.  Remand at 13-15.  (**JA000405-407**).  However, record evidence from AR 4, as well as court and agency precedent, directly contradict Commerce's position and establish that the omission of Ocean King from Hilltop's affiliation chart did not deprive Commerce from considering any necessary information to calculate Hilltop's AR 4 margin.

As discussed above, the application of facts otherwise available and an adverse inference requires that there be a "gap" of necessary information missing from the record.  If the unreported information is not necessary, then there is no valid basis for application of any adverse inference.  *See, e.g.*, *Shandong Huarong*, 30 CIT at 1297 (explaining that "the statute does not require Commerce to use an adverse inference in every instance where a respondent has not supplied information").  Under this principle, Commerce has previously determined that the failure to disclose an affiliate does not require an adverse inference unless the affiliate was involved in the production or sale of the subject merchandise during the period under review.

In *Certain Stainless Steel Butt-Weld Pipe Fittings From Taiwan,* Commerce found that the respondent, Ta Chen, had failed to disclose affiliations with four separate "Emerdex" companies, but it also determined that three of these four companies were not involved with the production or sale of subject merchandise during the POR.  *Certain Stainless Steel Butt-Weld Pipe Fittings From Taiwan,* 70

Fed. Reg. 1870 (January 11, 2005), and accompanying Issues & Decision Memo at

Cmt. 1.  Consequently, Commerce found it could only apply an adverse inference

against the one affiliate that was involved in sales or production of subject

merchandise:

> Ta Chen failed to act to the best of its ability by not
> promptly disclosing its affiliation with Emerdex 1, Emerdex
> 2, Emerdex 3 and Emerdex 4, despite three repeated requests
> by the Department throughout this administrative review.
> Based on the information eventually obtained from Ta Chen,
> the Department found in the Preliminary Results that, with
> regard to Emerdex 1, Emerdex 2, Emerdex 3 and Emerdex
> 4, these companies are affiliated with Ta Chen. See
> Preliminary Results at 40862.  Although record evidence
> suggests that Emerdex1, Emerdex 3 and Emerdex 4 did not
> have production or sales of subject merchandise during the
> POR, the Department continues to find that Ta Chen failed
> to cooperate with the Department to the best of its ability by
> not disclosing its affiliation with Emerdex 1, Emerdex 2,
> Emerdex 3 and Emerdex 4. See Preliminary Results at
> 40862. ***However, an adverse inference can only be applied
> to Emerdex 2***.

*Id.* (emphasis added).

Commerce argues in its Remand that Hilltop's reliance on *Butt-Weld Pipe

Fittings From Taiwan* is "misplaced" because Commerce did not apply total AFA

to the respondent. Remand at 53 (**JA0004085**).  Commerce, however, misses the

point and the relevance of this decision.  The decision in *Butt-Weld Pipe Fittings

From Taiwan* is apposite because it demonstrates that there is no basis for applying

an adverse inference for the failure to disclose an affiliate that is not involved in

the production or sale of subject merchandise.  Thus, while the Issues and Decision

Memo addresses four undisclosed affiliates, Commerce plainly states that it can

only apply an adverse inference with respect to the one affiliate (Emerdex 2) that

was involved in the production or sale of subject merchandise because only the

information from *this affiliate* was necessary information for the dumping analysis.

The CIT has also recognized this principle that the failure to report an

affiliate with no involvement in subject merchandise during the review is of no

consequence.  In *Ta Chen Stainless Steel Pipe Co.*, the court noted that it would be

"futile" to instruct Commerce on remand to consider unreported affiliates that were

uninvolved with the production or sale of subject merchandise because this

information would have no effect on the results:

> If, as the plaintiff and the defendant assert, the entities allegedly
> affiliated with Ta Chen within the meaning of 19 U.S.C. §
> 1677(33)(A) - (E) were in fact uninvolved with the subject
> merchandise, <u>a finding on remand of affiliation would not have
> any impact thereon</u>. And a court need not require an agency
> redetermination if doing so "would be 'futile' by virtue of
> having no effect on the result of the case." E.g., Ammex, Inc. v.
> United States, 28 CIT   ,   , 341 F.Supp.2d 1308, 1314 n. 12
> (2004).

*Ta Chen Stainless Steel Pipe Co. v. United States*, 31 CIT 794, 821-22 (2007)

(emphasis added).

Notably, in this case, the AR 4 record shows that Commerce did not view

information regarding Hilltop's third country affiliates as meaningful to its AR 4

margin calculation.  Hilltop's initial affiliation chart provided to Commerce included a third country shrimp producer in Thailand (a country with significant export volumes into the U.S. during AR 4).  *See* Hilltop's Section A Response at Exhibit A-2 (**JA0000098g-98l**).    However, Commerce asked no follow-up questions regarding this affiliate.  At no time did Commerce seek additional information regarding any third country affiliates or utilize this information in any manner when it calculated a 0% margin for Hilltop in the Preliminary Results.[8]  In particular, the Department did not request changes to Hilltop's sales or production databases or seek additional information on the impact of this relationship.   This fact is not surprising because (as discussed above) information regarding a third country affiliate that is not involved in the production, sale or distribution of subject merchandise is of no consequence in the calculation of a dumping margin.

Commerce acknowledges that in its Remand there were no shipments at all of shrimp from Cambodia during AR 4.  Moreover, the record shows that Hilltop (through its US affiliate, Ocean Duke) made only a de minimis quantity of sales of shrimp originating from Cambodia in AR 4.  In its comments addressing Commerce's Final remand Redetermination, Hilltop provided the following chart, which was originally provided in the AR 6 review:

---

[8] *See* Antidumping Duty Review of Certain Frozen Warmwater Shrimp From the People's Republic of China: Analysis for the Preliminary Results of Hilltop International (March 8, 2010) (**JA0000158-JA0000287**).

| Ocean Duke POR 4 (February 2008 - January 2009) Shrimp Sales | | | |
|---|---|---|---|
| Origin of Shrimp Sold | Quantity | Value | Percentage of Total POR 4 Shrimp Sold |
| China | [8,941,437.00] | [30,877,418.00] | [26.74%] |
| Cambodia | [96,627.00] | [391,016.00] | [0.34%] |
| India | [6,024.00] | [12,048.00] | [0.01%] |
| Thailand | [20,243,436.00] | [76,349,101.00] | [66.11%] |
| Vietnam | [1,177,221.00] | [7,857,210.00] | [6.80%] |
| Total shrimp sales | [30,464,745.00] | [115,486,793.00] | 100% |

As demonstrated by this chart, sales of shrimp originating from Cambodia only accounted for [0.34%] of all shrimp sales made by Ocean Duke in AR 4. *See* Defendant-Intervenor's Comments in Opposition to Final Remand Results at p. 12 (November 22, 2013) (**JA0004123**). Commerce has failed to show how this minute quantity could be pertinent to the overall margin analysis for AR 4.[9]

Hilltop's questionnaire responses also confirm that all subject PRC shrimp produced and sold during the POR were processed by its affiliated Chinese producers using farm-raised shrimp, and that none of these processors exported shrimp to other companies. *See* Hilltop's Supp. Section A Response at 14-17 (July 6, 2009) (**JA0000153-156**). Hilltop further provided a complete reconciliation of its shrimp production sold during the POR demonstrating that the shrimp sold came solely from self-raised shrimp thereby further establishing that no other entity (either within China or in a third country) was involved in the production of

---

[9] Moreover, there is absolutely no evidence on the record suggesting that this minute percentage of sales was actually China origin shrimp that should have been reported within this AR 4 proceeding.

the subject merchandise.  *See* Hilltop Initial Section D Response at Exhibit D-F-9 and Exhibit D-H-9 (July 22, 2009) (**JA0000136-145**).  Consequently, had Hilltop's original questionnaire response included Ocean King in its list of third country affiliates, the record confirms that this information would likewise have had *no impact on Commerce's margin calculation*.

In sum, both agency and court precedent, as well as Commerce's treatment of Hilltop's other third country affiliates within this very proceeding, all confirm that the failure to report an affiliate that is not involved with the production or sale of subject merchandise during the period of review is not an omission that affects the dumping margin and, consequently, not an event that warrants any adverse inference.  *Ta Chen Stainless Steel Pipe Co.*, 31 CIT at 821-22.  In light of this past practice and Commerce's own actions with respect to Hilltop's other third country affiliates in AR 4, Commerce has failed to offer a reasonable justification for applying total AFA to Hilltop for omitting to disclose the Ocean King affiliation.  *See Dongbu Steel Co., Ltd. v. United States*, 635 F.3d 1363, 1371 (Fed. Cir. 2011) ("an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently").

NON-CONFIDENTIAL VERSION

3.   **There Can Be No "Gap" With Respect To The Ocean King Affiliation Because Commerce Added All Information Regarding Ocean King To The AR 4 Record**

Even if one assumes that the Ocean King affiliation was a fact that could have an impact on Hilltop's AR 4 dumping margin, Commerce has still failed to provide a reasonable explanation for applying total AFA to Hilltop.  In its Final Remand, Commerce repeatedly argues that it was justified in applying AFA to Hilltop because it *lacked the time* to consider the implications of the affiliation with Ocean King:

> Because the fact that an affiliation existed between Hilltop and Ocean King throughout this POR was not revealed until approximately two years after the publication of the Department's final results in this review, the Department was precluded from determining to what extent Hilltop's responses failed to comply with our requests for information and requesting further information in the form of supplemental questionnaires.

Remand at 24 (**JA0004056**).  This is a disingenuous argument that ignores the sequence of events in this AR 4 appeal.

The AR 6 Final Results were published by Commerce on September 4, 2012.  On December 18, 2012, the Government filed its Motion for a Voluntary Remand of the AR 4 appeal specifically to give Commerce the opportunity to consider the implications of the unreported affiliation with Ocean King in the context of this AR 4 proceeding.  DOJ Motion to Expand (**JA0000376-JA0000380**).  After this Court granted the Government's motion, the CIT provided

Commerce almost *four months* (from July 19, 2013 – November 4, 2013) to conduct its remand and consider this new information from AR 6 (*i.e.*, the Ocean King affiliation) and determine its impact on this AR 4 proceeding.

As part of its expanded remand, Commerce added to the record in AR 4 all information from AR 6 relevant to Ocean King. One of the AR 6 documents that Commerce added to the AR 4 record was Hilltop's June 26, 2012 Seventh Supplemental Response. In this submission, Hilltop acknowledged the affiliation with Ocean King and provided *over 90 pages* of documentation regarding Ocean King, including its corporate registration documents, articles of association and a complete list of all shareholders and a history of all share transfers. *See* Hilltop POR 6 Seventh Supplemental Response at Ex. 1 and "Additional Documents" (June 27, 2010) (**JA0003706-3810**). In addition to providing all information regarding Ocean King that Commerce had requested, Hilltop once again stated unequivocally in this submission that the affiliation with Ocean King did not affect any of its reported sales or FOP data. *Id*. at 2 (**JA0003703**) ("we also note that CBP data on the record confirms that Hilltop made no shipments of shrimp from Cambodia during the fourth, fifth or sixth AR periods {and} the only sales of Cambodian origin shrimp made during the fourth, fifth or sixth AR periods occurred in the fourth AR and consisted of {a de minimis amount of} product sold by Ocean Duke from pre-existing inventory.")

In sum, Commerce's claim that the information regarding Ocean King "came too late for the Department and interested parties to fully examine the impact this relationship may have had on the sale and production of subject merchandise in AR 4" is without merit.  Remand at 17 (**JA0004049**).  Commerce was aware of the Ocean King affiliation at the time it requested the voluntary remand in AR 4, and it was given four months to consider this issue further but failed to solicit any additional information from Hilltop about Ocean King's involvement in any AR 4 activities.

Furthermore, the supplemental materials that Commerce requested in AR 6 and then added to the AR 4 record already contained a wealth of information about Ocean King and confirmed again that the company had nothing to do with the production or sale of subject shrimp in this review.  Having initially requested this information in AR 6 and then having placed it on the record in AR 4, Commerce cannot ignore this record evidence and claim it has "insufficient information" regarding Ocean King.  *See GPX Int'l Tire Corp. v. United States*, 893 F. Supp. 2d 1296, 1333 (Ct. Int'l Trade 2013) (explaining that when "Commerce decided to solicit information . . .  it could not arbitrarily reject relevant information that is then provided . . . simply because it does not like the relevant information submitted").

NON-CONFIDENTIAL VERSION

All record evidence supports Hilltop's repeated assertions that Ocean King was uninvolved with the production and sale of subject merchandise during the review.  Indeed, Commerce acknowledges that there were no shipments of shrimp from Cambodia to the U.S. during either AR 4 or 5.   Consequently, the disclosure of Ocean King should be treated no differently than the disclosure of other affiliated third-country shrimp producers, which (as discussed above) was not pertinent information to Hilltop's margin calculation.

### B.   THE OMISSION OF OCEAN KING FROM HILLTOP'S AFFILIATION CHARTS WAS NOT "CORE" INFORMATION THAT COULD JUSTIFY APPLICATION OF TOTAL AFA

Commerce also cannot support its use of total AFA against Hilltop by claiming that the omission of Ocean King from the list of third country affiliates justifies the rejection of all of Hilltop's reported data.  *See* Remand at 2 (**JA0004034**).  This Court and the CIT have fully considered the question of when Commerce may resort to total AFA rather than partial AFA and have repeatedly stated that a resort to total AFA is only permissible if the missing or unusable information is "core" rather than "tangential" to Commerce's dumping determination or where the deficiencies are so pervasive that they permeate all aspects of the reported data.  *See, e.g.*, *Zhejiang Dunan*, 652 F.3d at 1348 (stating that total AFA is appropriate "where none of the reported data is reliable or usable" because, for example, the "submitted data exhibited pervasive and persistent

deficiencies that cut across all aspects of the data"); *Shanghai Taoen Int'l Trading Co. v. United States*, 29 CIT 189, 199 n.13 (2005) (discussing the difference between the absence of "core" data that requires Commerce to resort to total AFA and "tangential" data that would only require a partial facts available to fill a gap in the record); *Krupp Thyssen Nirosta GMBH v. United States*, 24 CIT 666, 670-672 (2000) (rejecting Commerce's decision to apply total AFA to USR because the identified errors only affected USR's further manufacturing data); *Ferro Union, Inc. v. United States*, 23 CIT 713, 714-16 (1999) (rejecting Commerce's initial decision to apply total AFA to a respondent that failed to report affiliated home market resellers, but accepting the use of partial AFA for the missing home market sales data).

The cases in which the CIT has affirmed Commerce's rejection of all a respondent's reported data have involved situations in which the respondent provided false or deficient information that had a *direct and material impact* on the data necessary for the dumping margin calculation.  *See, e.g., Jiangsu Changbao Steel Tube Co., Ltd. v. United States*, 884 F. Supp. 2d 1295, 1305-06 (Ct Int'l. Trade 2012) (sustaining the application of total AFA because of the discovery of false statements and altered production and accounting records that impeached the reliability of all reported data); *Shanghai Taoen,* 29 CIT at 199 n. 13 (finding the use of total facts available appropriate because the deficient information left

Commerce with no reliable data to calculate a margin); *Foshan Shunde Yongjian Housewares & Hardware Co. v. United States*, 35 CIT __, 2011 Ct. Intl. Trade LEXIS 123 at *36-*42 (sustaining the rejection of all production and sales data because Foshan's misleading responses affected a substantial portion of the necessary data); *Since Hardware (Guangzhou) Co. v. United States*, 34 CIT __, 2010 Ct. Intl. Trade LEXIS 119 at *26 (sustaining the rejection of all of respondent's reported data because "the missing information on production inputs goes to the core of the antidumping duty rate determination"); *Qingdao Taifa Group Co. v. United States*, 33 CIT 1090, 1097 (Ct. Intl Trade 2009) (sustaining the rejection of all reported data because the company's incomplete and unreliable information affected all production data such that "no information on the record could be used to calculate an accurate dumping margin for Taifa"). Likewise, the cases Commerce cites to for its authority to "cleanse its proceedings of potential fraud" involve instances where the respondent admitted to submitting falsified documents that had a direct and material impact upon the dumping margin calculation. *See Tokyo Kikai Seisakushu Ltd. v. United States,* 529 F.3d 1352, 1357 (Fed. Cir. 2008) (noting that TKS had provided a "secret rebate" to its U.S. customers to inflate its reported U.S. sales prices); *Home Prods. Int'l v. United States*, 633 F3d 1369, 1374 (Fed. Cir.2011) (noting that Home Products

acknowledged its submissions contained falsified mill certificates to obtain a lower surrogate value).

In contrast to the cases noted above, in the instant appeal Commerce has failed to demonstrate how the missing affiliation information for Ocean King would cause all of Hilltop's reported sales and production data to be treated as unusable.  Instead, Commerce simply relies upon conclusory statements:

> Because Hilltop submitted material misrepresentations with regard to its affiliations, and certified to the accuracy of such false information, we find that we cannot rely on any of the information submitted by Hilltop in this review.

Remand at 16 (**JA0004048**).  Commerce's reasoning is unpersuasive.  Information regarding third country affiliates is a very discreet and narrow category of information, and Commerce has failed to show a rational connection between a deficiency in this narrow category and all reported data submitted by Hilltop.  *See, e.g., Save Domestic Oil, Inc. v. United States,* 357 F.3d 1278, 1282, (Fed. Cir. 2004) (internal quotation omitted) (Commerce must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made").   Absent a showing supported by substantial evidence that all information is unusable, it is improper for Commerce to disregard such information as an adverse inference for the deficient affiliation information.  *See Zhejiang Dunan*, 652 F.3d at 1348 (citing *Gerber Food (Yunnan) Co. v. United States*, 29 CIT 753 (2005)).

In *Gerber Foods*, which this Court cited with approval in *Zhejiang Dunan*, the CIT rejected a similar argument by Commerce that it could simply reject all of a respondent's reported data and apply the China-wide rate as an "adverse inference." In rejecting this theory, the court noted the following:

> The statute does not permit Commerce to choose an antidumping duty assessment rate as an "adverse inference" without making factual findings, supported by substantial evidence, justifying a conclusion that the body of record information necessary to the calculation of that assessment rate is to be rejected for reasons consistent with the statutory scheme, including in particular § 1677e(b) when read in conjunction with § 1677e(a) and § 1677m(e).

*Gerber Foods*, 29 CIT at 770. Commerce's decision in the Final Remand to reject all of Hilltop's reported data and apply total AFA lacks this necessary factual finding supported by substantial evidence. *Id*.

Commerce in its Final Remand, and the trial court assert that the failure to report the Ocean King affiliation undermines the credibility of all of Hilltop's affiliation and corporate structure information, which therefore justifies Commerce's decision to treat Hilltop as part of the PRC-wide entity:

> Thus, the material information that Commerce ultimately found to be missing from the record was a reliably accurate representation of Hilltop's corporate structure and the extent of government control potentially exercised through its Chinese affiliates. Because the accuracy of all representations in this regard was certified by Mr. To, … Commerce reasonably discredited these representations as unreliable.

Slip Op. 14-55 at pp. 14-15 (**JA0000031-32**).

However, this is a flawed argument.  As discussed in Part II of this brief, below, Commerce has a well-established policy of automatically granting separate rate status to all exporters located in Hong Kong (such as Hilltop), and the record confirms that _none_ of Hilltop's affiliation or corporate structure information was the basis for its separate rate eligibility.  The claims by Commerce and the trial court that Hilltop's reported affiliations were in any way related to its eligibility for separate rate status are directly contradicted by Commerce's own established policy and by the record evidence showing the basis of the preliminary separate rate finding for Hilltop.

Equally without merit is Commerce's theory that Hilltop's AR 4 sales data can be disregarded because of unsubstantiated allegations that there were unreported entries in AR 1 and AR 2.  *See* Remand at 13-14 (**JA0004045-4046**).  It is well settled that each administrative review has its own record with unique facts and that the results of each review should be based upon this segment-specific record.  *See, e.g., Peer Bearing Co.-Changshan v. United States*, 587 F. Supp. 2d 1319, 1325 (2008) (explaining that "each administrative review is a separate segment of proceedings with its own unique facts" ); *Taian Ziyang Food Co. v. United States*, 783 F. Supp. 2d 1292, 1317 (Ct. Int'l Trade 2011)  ("the rule of law . . . requires that Commerce take pains to ensure that each issue in each case is decided on the specific facts on the record of that case."); *PAM, S.p.A. v. United*

*States*, 31 CIT 1008, 1021 (2007) ("this Court recognizes that previous dumping margins are not necessarily indicative of current margins as 'each review stands on its own'").

Notwithstanding this well-settled tenet, Commerce seeks to penalize Hilltop in AR 4 for activities that it alleges occurred in AR 1 and AR 2.[10]  Notably, the CIT rejected a similar argument that a respondent's actions in a prior review could justify an adverse inference in subsequent reviews in an appeal of AR 4 for Shrimp from the PRC.  In *Ad Hoc Shrimp Trade Action Comm. v. United States*, 828 F. Supp. 2d 1345 (Ct. Int'l Trade 2012), the trial court rejected an argument by Petitioner that misclassifications of entries in AR 3 should result in the presumption that entry data in AR 4 were also unreliable:

---

[10] Beyond the immediate problem of linking alleged circumvention or transshipment in AR 1 or AR 2 to a dumping margin calculation in AR 4, the "evidence" Commerce repeatedly points to raises other problems with Commerce's attempts to categorize the affiliation with Ocean King as "core" information in this review.  Commerce repeatedly refers to the fact that Ocean Duke imported 6.8 million kilograms of shrimp from Cambodia between May 2004 and July 2005. Remand at 10 (**JA0004042**).  However, the record shows that <u>Ocean King was not established until July 2005</u>.  *See* Hilltop POR 6 Seventh Supp. Response at Ex. 1 (**JA0003706-3751**).  Thus, there is no plausible link between these historical shipments and the unreported affiliation with Ocean King.  Furthermore, all the internal correspondence that Commerce claims "suggests" that there was transshipment or circumvention in ARs 1 and 2 mention <u>Vietnam</u> and <u>not China</u>. *See, e.g.,*  Remand at 9-10 and notes 45 and 49. (**JA0004041-42**).  Commerce has failed to explain how a speculative theory regarding transshipment from Vietnam in ARs 1 and 2 can be the lawful basis for an AFA determination in a *China proceeding* in AR 4.

> The record shows that in the third administrative review, the Type 03 CBP Data for Regal was inaccurate; however, in the fourth administrative review that inaccuracy was not present. Though it is true that the "determination of data inaccuracies in a separate review of the same producer/exporter, subject to the same antidumping duty order, casts doubt on similar data regarding such producer/exporter in an adjacent review," Ad Hoc I,   CIT at  , 791 F. Supp. 2d at 1333 (construing *Home Products Int'l, Inc. v. United States*, 633 F.3d 1369, 1380-81 (Fed. Cir. 2011)), evidence from the latter review showing that the inaccuracy no longer exists resolves such doubt. Thus, evidence that an importer inaccurately completed Form 7501 in a prior review *but did not perpetuate similar inaccuracies in the review at issue* is insufficient to impugn the behavior of importers generally or the reliability of the data.

*Id.* at 1352 (emphasis in original). As discussed above, it is undisputed that there were no entries of Cambodian shrimp at all into the US during either AR 4 or AR 5. Thus, even if one accepts, *arguendo*, Commerce's speculative theory regarding transshipment through Cambodia in AR 1 or AR 2, this fact would not be a sufficient basis to impugn the reliability of Hilltop's data in AR 4. *Id.* Furthermore, Commerce's argument regarding "potential flaws" in the AR 1 deposit rate affecting the credibility of Hilltop's current sales database is specious. *See* Remand at 13-14 (**JA0004045-46**). As this Court knows, deposit rates are not used in the calculation of a respondent's dumping margin. Deposit rates are merely *estimates* of the ultimate antidumping duty liability based on prior results, while the ultimate assessment rate for a review is based upon the respondent's

sales practices during the current period of review.  *See, e.g.*, *Decca Hospitality Furnishings, LLC v. United States*, 30 C.I.T. 357, 358-59 (2006).

In sum, the record fails to show that the omitted affiliation was "core" information, and there is no support for Commerce's claim that this unreported affiliation with a company not involved with the production and sale of subject merchandise in AR 4 "impugn{s}the overall credibility of information supplied by Hilltop officials."  Remand at 53 (**JA0004085**).  Consequently, Commerce's decision to apply total adverse facts available to Hilltop is unsupported by record evidence.  Commerce's argument is essentially an attempt to circumvent the restrictions imposed by the statute and the courts on the proper use of adverse inferences.  Having failed to establish that the information regarding the Ocean King affiliation was necessary to the AR 4 dumping calculation, Commerce seeks to reject *all necessary information* under the theory that Hilltop's failure to provide unnecessary information about Ocean King "undermines the credibility and reliability of Hilltop's data overall for AR 4."  *Id.* at 25 (**JA0004057**).  Under Commerce's theory, any omission by a respondent - regardless of the significance of the information - provides Commerce the authority to reject all of the respondent's data and apply total AFA.  This theory is directly contrary to the plain language of the section 1677e, which limits the use of facts available and adverse inferences to the specific information found missing or unusable, and to the court

precedent discussed above limiting the use of total AFA to situations where "core" data is unusable.

### C.    IT WAS IMPROPER FOR COMMERCE TO CONSIDER TRANSSHIPMENT OR CIRCUMVENTION ALLEGATIONS WITHIN ITS AR 4 PROCEEDING

Even if the record herein did contain substantial evidence to support allegations of transshipment or circumvention, it would be improper to address such allegations in the context of the AR 4 proceeding.  Administrative reviews of dumping orders are governed by 19 U.S.C. § 1675(a).  An inquiry into the circumvention of a dumping order is an entirely separate proceeding that is governed by 19 U.S.C. § 1677j.  Circumvention inquiries have completely separate procedures than Section 751 administrative reviews. When a circumvention inquiry is properly requested, Commerce initiates a separate proceeding and issues a separate final determination that is not associated with any administrative review proceeding.  *See, e.g.*, *Laminated Woven Sacks From the People's Republic of China: Negative Final Determination of Circumvention*, 78 Fed. Reg. 12,716 (February 25, 2013).   Thus, an administrative review and an anticircumvention inquiry are required to be conducted as two separate and distinct proceedings.

Furthermore, Commerce has repeatedly stated that an administrative review is *not* the forum in which to address circumvention claims, and it has stated that the Department is not even the proper agency to address transshipment claims.  *See,*

42

*e.g.*, *Certain Activated Carbon From the People's Republic of China: Preliminary Results of the Third Antidumping Duty Administrative Review, and Preliminary Rescission in Part,* 76 Fed. Reg. 23,978 (April 29, 2011) (stating that where a party makes allegations regarding transshipment "a scope or anti-circumvention inquiry is the proper venue and we will not consider it within the context of an administrative review" and further stating that allegations of circumvention with no third country processing "should be directed to CBP, which is the proper authority to investigate claims of mislabeling country-of-origin"); *Certain Kitchen Appliance Shelving and Racks From the People's Republic of China: Final Results and Partial Rescission of First Antidumping Duty Administrative Review*, 77 Fed. Reg.  21,734 (April 11, 2012) (declining to initiate AD reviews when the only reason offered for the request was an allegation of transshipment).

In *Globe Metallurgical Inc. v. United States*, 722 F. Supp. 2d 1372 (Ct. Int'l Trade 2010), the CIT considered a remand redetermination in which Commerce declined to consider allegations of transshipment on the basis that it <u>*lacked statutory authority*</u> to make such an investigation without some third country processing:

> {W}e emphasize that the Department's statutory authority to investigate circumvention of an order is limited to circumstances where some further processing is performed on the product in the third country before exportation to the United States . . . Allegations that concern transshipment, without any further processing of subject merchandise in a third country are

> better addressed under CBP's authority to impose monetary penalties pursuant to fraud, gross negligence, and negligence. See 19 USC 1592. . . . Specifically, the Department's authority to address such scenarios is constrained by the requirement that there must be some processing taking place in the third country (i.e., Canada) for the Department to determine whether the merchandise is subject to the order. The governing statute expressly links the Department's authority to the question of whether there is third-country processing taking place. For example, 19 USC 1677j, which concerns the Department's authority to prevent the circumvention of AD/CVD orders through the importation of merchandise completed or assembled in other foreign countries, sets forth that the Department must examine processing of the merchandise in the third-country. See 19 USC 1677j(b)(1). Indeed, the overall approach of 19 USC 1677j instructs the Department to evaluate third-country processing in its analyses. See generally 19 USC 1677j.

*Globe Metallurgical Inc.*, 722 F. Supp. 2d at 1378-79.  The court sustained Commerce's refusal on remand to consider the transshipment allegation as "a cogent, complete, and reasonable explanation for Commerce's handling of Globe's standalone transshipment allegation against Ferro-Alliages." *Id.* at 1382.

Having repeatedly confirmed that it does not have the authority to investigate transshipment (or, at least, that transshipment must be investigated pursuant to a circumvention inquiry under 19 U.S.C § 1677j), Commerce seems to believe that it can *assume* that transshipment has occurred without the benefit of any such finding by Commerce or any other agency.  Commerce recognizes that no transshipment or circumvention inquiry was ever initiated with respect to these allegations about Cambodian shrimp.  Nonetheless, a number of Commerce's

arguments in the 1st Remand are predicated on the view that there has been a valid finding of transshipment already.  *See, e.g.*, Remand at 10 (**JA0004042**) ("The true country-of-origin of these imports is necessarily in question and internal communications suggest that at least some imports came from Vietnam."); *id.* at 16 (**JA0004048**) ("We find that Hilltop . . . repeatedly withheld information regarding alleged transshipment activities."); *id.* at 64 (**JA0004096**) ("the Department is inclined to accept this evidence at face value which indicates that Hilltop and Ocean Duke were engaged in transshipping shrimp through Cambodia"). This assumption of transshipment or circumvention without any underlying proceeding or finding violates basic tenets of administrative procedure and constitutes clear error by Commerce.  *See, e.g., Mitsubishi Elec. Corp. v. United States*, 16 CIT 730, 739 (1992) ("The Court notes that if Commerce is concerned about the possibility of circumvention, the appropriate method to resolve such concern would appear to be proceedings under the provisions specifically designed to prevent circumvention."); s*ee also Laminated Woven Sacks Comm. v. United States*, 716 F. Supp. 2d 1316, 1328 (Ct. Int'l Trade 2010) (explaining that the Department may not address anticircumvention claims in the context of a normal scope ruling proceeding because an "anticircumvention inquiry is a specific type of scope inquiry governed by its own statutory provision, 19 U.S.C. § 1677j(d), which codifies Commerce's administrative practice. See 19 C.F.R. § 351.225(j).").

Administrative reviews have a very clear and express purpose: to determine the amount of antidumping duties applicable for the specific period under review. 19 U.S.C. § 1675(a).  Administrative reviews are not a platform for the Department to make general inquiries into alleged import wrongdoing, and any such findings or allegations cannot serve as the basis for an adverse finding within an administrative review.  Moreover, it is well settled that antidumping duties are designed to be remedial relief and not a punitive measure.  *See, e.g., NTN Bearing Corp. v. United States*, 73 F.3d 1204, 1208 (Fed. Cir. 1995).  In this instance, the punitive nature of the Department's actions could not be more evident.  The Department has speculated that Hilltop engaged in transshipment *years earlier* and is punishing the company now for that alleged action despite no rational connection between that alleged incidents and this AR 4 proceeding.  This overreaching of its authority and the failure to follow its self-acknowledged limitations regarding transshipment allegations and inquiries is a plain abuse of the agency's authority to apply AFA in the context of an administrative review.

## III.   IT WAS IMPROPER TO TREAT HILLTOP AS PART OF THE PRC-WIDE ENTITY BECAUSE INDEPENDENT RECORD EVIDENCE CONFIRMS HILLTOP IS A HONG KONG EXPORTER EXEMPT FROM THE SEPARATE RATE TEST

The discussions above show that Commerce had no valid basis to reject all of Hilltop's reported data and apply total AFA.  Furthermore, even if the circumstances did support this severe action, it was still improper to consider

NON-CONFIDENTIAL VERSION

Hilltop part of the PRC-wide entity because Commerce has repeatedly confirmed that exporters located in Hong Kong and other market economy locations are exempt from the separate rate test and are automatically granted separate rate status.

In antidumping duty cases involving non-market economy ("NME") countries, Commerce has a rebuttable presumption that all exporters within the NME country are subject to government control and should be assigned a single country-wide rate. The separate rate analysis is a test Commerce utilizes in NME cases to determine if an exporter has both *de jure* and *de facto* autonomy from the government in its export operations and thus is eligible to receive an independent dumping rate rather than the country-wide rate.[11]   Notably, Commerce has plainly stated, and the courts have confirmed, that the separate rate test focuses on the activities and situation of the *exporter* rather than the producer (if these are two different entities).  *See Advanced Tech. & Materials Co. v. United States*, 885 F. Supp. 2d 1343, 1349 (Ct. Int'l Trade 2012) ("There is no dispute that the focus of the separate rates test here is the AT&M entity's export operations, that Commerce's test applies only to exporters"); *Luoyang Bearing Corp. v. United*

---

[11] The separate rate test is discussed at length in the often referenced *Final Determination of Sales at Less Than Fair Value: Sparklers from the People's Republic of China*, 56 Fed. Reg. 20588 (May 6, 1991) (" *Sparklers*"), and was further developed in *Final Determination of Sales at Less Than Fair Value: Silicon Carbide from the People's Republic of China*, 59 Fed. Reg. 22585 (May 2, 1994) (" *Silicon Carbide*").

NON-CONFIDENTIAL VERSION

*States*, 29 CIT 24, 31 (2005) ("a separate rate analysis is used to determine whether the exporter, not the producer of the subject merchandise, is an autonomous market participant").

Commerce has also repeatedly stated that certain exporters in NME cases are exempt from the separate rate analysis. Specifically, Commerce's established policy is that exporters who are 100% foreign-owned and/or exporters who are located in a market economy country are not subject to the separate rate analysis and receive separate rate status automatically. *See, e.g., Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses From the People's Republic of China: Notice of Preliminary Determination of Sales at Less Than Fair Value*, 75 Fed. Reg. 24,892, 24,900 (May 6, 2010) ("As information on the record demonstrates that GEHK is located in Hong Kong, consistent with our practice, we have not conducted a separate rate analysis of GEHK."); *Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China; Preliminary Results of Antidumping Administrative Review and Intent To Revoke Antidumping Duty Order in Part*, 61 Fed. Reg. 40,610, 40,611 (August 5, 1996) ("Finally, with respect to Premier, no separate rates analysis is required because this company is a privately owned trading company located in Hong Kong"); *Fresh Garlic From the People's Republic of China: Preliminary Results of New Shipper Review of Shijiazhuang Goodman Trading Co.,* Ltd., 78

NON-CONFIDENTIAL VERSION

Fed. Reg. 67,112 (November 8, 2013), and accompanying Preliminary Decision

Memo at "Separate Rates" ( "if the Department determines that a company is

wholly foreign-owned **or located in a market economy** ("ME"), then a separate

rate analysis is not necessary to determine whether it is independent from

government control.") (emphasis added).[12]

In a July 2013, Federal Register notice regarding changes to its separate rate

policy, Commerce once again plainly confirmed that exporters located in market

economy countries are exempt from the separate rate test.  In the introduction to its

notice, Commerce provided the following background to its separate rate test:

> It has been the Department's practice to assign all exporters of
> merchandise subject to an antidumping investigation or review
> from an NME country this single rate unless an exporter can
> demonstrate that it is sufficiently independent of the
> government in its export activities, on both a *de jure* and *de
> facto* basis, so as to be entitled to a separate rate. … **However,
> if the Department determined that an exporter of NME-
> produced merchandise is wholly foreign-owned or located
> in a market economy ("ME") country, the exporter has not
> been subject to the separate rates test.**

*De Facto Criteria for Establishing a Separate Rate in Antidumping Proceedings*

*Involving Non-Market Economy Countries*, 78 Fed. Reg. 40,430, 40,430-31 (July

5, 2013) (emphasis added).  In this same Federal Register notice, Commerce

---

[12] Although Hong Kong has been a Special Administrative Region of the People's
Republic of China since 1997, the Department of Commerce continues to treat
Hong Kong as a separate and autonomous region that is afforded market economy
status. *See Application of U.S. Antidumping and Countervailing Duty Laws to
Hong Kong*, 62 Fed. Reg. 42965 (Dep't of Commerce Aug. 11, 1997).

addressed a comment suggesting that it should revise its policy of automatically

granting separate rate status to companies with an export office located in a market

economy country:

> C. Do Not Automatically Grant Separate Rates to Firms With Trading Arms and/or Producers Located in Market Economies
>
> One commenter suggested that **the Department should end its practice of automatically granting separate rates to companies with export offices in ME countries** because the respondent can simply set up a shell company in an ME to avoid a separate rate analysis. We agree that there is a legitimate concern that NME producers under government control selling through affiliated third-country resellers may, in fact, control that reseller and, in such cases, the reseller's exporting activities would also be under government control. However, **we do not consider that the potential for this scenario warrants a wholesale change in practice**. Rather, in cases where a respondent has a producing entity in the PRC and an affiliated reseller in an ME country, we will endeavor to examine, on a case-by-case basis, whether any supplemental information is required to determine if the affiliated reseller is under government control through the producer located in the NME country.

*Id*. at 40,432 (emphasis added).  As these citations confirm, at the time of the

review Commerce had a well-established practice that exporters located in market

economy countries (such as Hong Kong) were exempt from the separate rate test

and were <u>automatically granted separate rate status</u>. *Id*.

The record in this case contains very clear proof that Hilltop is located in

Hong Kong.  Exhibit A-5 of Hilltop's Section A Response contains Hilltop's

"Form 2 Business Registration Certificate" (Hong Kong Business License), and

NON-CONFIDENTIAL VERSION

Exhibit A-6 contains Hilltop's "Form 1c Business Registration Application" (Hong Kong Business Registration Form). (**JA0000101, JA0000130-132**). Both of these documents confirm that Hilltop is located in Hong Kong, and the Business Registration Form confirms that Hilltop is 100% market economy owned.[13]

Notwithstanding this clear policy exempting Hong Kong based exporters from the separate rate analysis, Commerce determined in its Final Remand that it was appropriate to consider Hilltop part of the China-wide entity. While Hilltop argued that such a finding was improper because Commerce had specifically confirmed that Hilltop was exempt from the separate rate test, Commerce rejected this argument in its 1st Remand:

> Although Hilltop claims that it is a Hong Kong-based exporter and therefore placement in the PRC-wide Entity is inappropriate, the undisclosed affiliation and unreliability of information on the record prevent us from determining with certainty the ownership and/or control of Hilltop.

Remand at 58 (**JA0004090**). The trial court adopted similar reasoning to sustain Commerce's decision to deny Hilltop separate rate status:

> While Hilltop emphasizes independent record evidence that it is registered in Hong Kong, see, e.g., Hilltop's AR 4 Br. at 24-33 (relying on evidence of Hilltop's Hong Kong Business License and Hilltop's Hong Kong Business registration Form), Hilltop's

---

[13] As plainly stated in the Preliminary Results, Commerce's policy only requires proof that the exporter is **located** in Hong Kong. However, Hilltop notes that the record does establish both that Hilltop is a Hong Kong based exporter and that it is owned by individuals who do not reside in mainland China. *See* Hilltop Section A Response at Ex. A-5, A-6 (**JA0000101, JA0000130-132**).

> registration in Hong Kong is not in itself dispositive because it does not address the potential for government control through Hilltop's disclosed and possibly additional undisclosed PRC affiliates.

Slip Op. 14-55 at p. 15, note 31. (**JA0000032**).

However, the reasoning offered by Commerce and the trial court on this issue is flawed.  As demonstrated above, Commerce's well-established policy exempts exporters located in Hong Kong from the separate rate test and automatically grants them separate rate status.  Even if Commerce alleges that all statements made by Hilltop are unreliable, this conclusion could have no impact on Hilltop's separate rate status because the finding that Hilltop is located in Hong Kong was not based upon "statements" by Hilltop, or on the ownership status of any of its mainland China or third-country affiliates.  As discussed above, the record contains independent and objective documentation in the form of Hilltop's Hong Kong Business License and its Hong Kong Business Registration that establish that Hilltop is located in Hong Kong.   These are official documents issued by the government of Hong Kong, and they constitute independent proof that Hilltop is a Hong Kong-based exporter.   Commerce could have verified the accuracy of these documents without reliance on any statements by Hilltop officials.

Moreover, the record contains proof that Commerce has previously conducted an on-site verification at Hilltop's offices in Hong Kong.  One of the

documents added to the record by petitioner in this review was Commerce's

verification report from the first review of Hilltop's predecessor company, HK

Yelin.  The POR 1 verification of Hilltop's predecessor company, HK Yelin, took

place in Hong Kong on January 22-23, 2007.  Since HK Yelin became Hilltop in

late 2006, this verification actually took place in Hilltop's office.  The verification

report also confirms that Commerce verifiers examined Hilltop's Hong Kong

business registration.  *See* Petitioner's AR 6 Submission of Factual Information to

Rebut, Clarify or Correct at  Attachment 3, page 5 February 27, 2007 Verification

Report of Yelin Enterprises Hong Kong (April 19, 2012) ("We reviewed HK

Yelin's original 2004-2005 and 2005-2006 business licenses, and Hilltop

International's 2006-2007 business license, which are renewable every year. We

also reviewed HK Yelin's business registration documents, and amendment

history, as well as Hilltop International's business registration documents.")

(**JA0001733**).

Based on the above, Commerce's refusal to consider Hilltop's Hong Kong

Business License and Business Registration to confirm that Hilltop is located in

Hong Kong violates 19 U.S.C. § 1677m(e), which *prohibits* Commerce from

declining to consider information that satisfies the provision's enumerated

requirements.  Specifically, the submitted Hong Kong business license and

registration for Hilltop satisfy the requirements of 1677m(e) because:

NON-CONFIDENTIAL VERSION

- this information was submitted in a timely manner as part of Hilltop's Section A  Response (1677m(e)(1));

- this information could be independently verified if Commerce elected to verify it[14] (§ 1677m(e)(2));

- this information is complete enough to confirm independently that Hilltop is a Hong Kong-based exporter (§ 1677m(e)(3));

- Hilltop acted to the best of its ability to demonstrate that it is a Hong Kong-based exporter by providing these documents (§ 1677m(e)(4)); and

- this information can be used to confirm that Hilltop is a Hong Kong-based exporter without any difficulties since this is the exact information Commerce relied upon in its Preliminary Results to find Hilltop located in Hong Kong (§ 1677m(e)(5)).

For these reasons, Commerce's determination that Hilltop should be considered part of the PRC-wide entity was unsupported by record evidence and contrary to law.  Commerce's stated policy is to give separate rate treatment to exporters located in Hong Kong, and the record contains independent documentation confirming the fact that Hilltop is a Hong Kong-based exporter.

---

[14] *See China Kingdom Import & Exp. Co. v. United States*, 31 CIT 1329, 1349 n.7 (2007) (stating that a "refusal to subject certain factual information to a verification procedure is not the equivalent of a valid finding that, for purposes of §1677e(a)(2)(D), such information 'cannot be verified'").  Furthermore, as noted above, Commerce has previously reviewed Hilltop's Hong Kong business license during on-site verification.

NON-CONFIDENTIAL VERSION

Commerce's refusal to consider this information (even if its decision to reject all of

Hilltop's other data is valid) violates Section 1677m(e).[15]

## IV.    THE DEPARTMENT'S CORROBORATION OF THE AFA RATE APPLIED TO HILLTOP AS PART OF THE PRC-WIDE ENTITY WAS UNSUPPORTED BY SUBANTIAL EVIDENCE AND CONTRARY TO LAW

### A.    THE CORROBORATION FRAMEWORK

The statute permits Commerce to rely upon "secondary information" when

making an adverse inference, but it also contains an express requirement that

Commerce shall, to the extent practicable, "corroborate that information from

independent sources."  19 U.S.C. § 1677e(c).  While the statute does not provide a

definition of "secondary information," the SAA notes that secondary information is

information "derived from the petition that gave rise to the investigation or review,

the final determination concerning the subject merchandise, or any previous review

under section 751 concerning the subject merchandise." Statement of

Administrative Action Accompanying Uruguay Round Agreements Act, H.R. Doc.

No. 103-316 at 870, *reprinted* in 1994 U.S.C.C.A.N. 4040, 4199 (1994) ("SAA").

---

[15] *Compare to AMS Assocs. v. United States*, 719 F.3d 1376 (Fed. Cir 2013), in which the court found Commerce's treatment of Zibo Aifudi as part of the China-wide entity did not violate Section 1677m(e) because Aifudi was a Chinese company subject to the separate rate test and it had withdrawn from the record submissions containing the necessary information for the *de facto* separate rate analysis. *Id*. at 1379-80.  In the instant case, the only information necessary to establish Hilltop's entitlement to a separate rate is the information confirming its location as a Hong Kong-based exporter, and the information necessary to confirm Hilltop's location is on the record and satisfies all the criteria of 1677m(e).

A similar definition is also contained in Commerce's regulations. *See* 19 C.F.R. § 351.308(c)(1).

The regulations and SAA define "corroboration" as an examination of whether "the secondary information to be used has *probative value*."  SAA at 870 (emphasis added).  This corroboration requirement is necessary as "secondary information may not be entirely reliable because, for example, as in the case of the petition, it is based on unverified allegations, or as in the case of information from prior section 751(a) reviews, it concerns a different time frame than the one issued." SAA at 870; *see also Foshan Shunde Yongjian Housewares & Hardware Co. v. United States*, 991 F. Supp. 2d 1322, 1328 (Ct. Int'l Trade 2014) ("In creating this {corroboration} requirement, Congress expressly intended to check the Department's ability to select potentially suspect secondary information when drawing adverse inferences.").

The CIT has noted that "{i}n order to comply with the statute and the {SAA}'s statement that corroborated information is probative information, Commerce must assure itself that the margin it applies is relevant, and not outdated, or lacking a rational relationship to {the respondent}." *Ferro Union, Inc. v. United States*, 23 CIT 178, 205 (1999).  This Court distilled this premise more recently in *Gallant Ocean (Thail.) Co*., explaining that Commerce must select a rate using reliable facts with "some grounding in commercial reality." *Gallant*

*Ocean (Thail.) Co. v. United States*, 602 F.3d 1319, 1323-1324 (Fed. Cir. 2010);

*see also F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United State*s, 216

F.3d 1027, 1032 (Fed. Cir. 2000) (explaining that Congress' inclusion of the

corroboration requirement in the statute was "done so to prevent the petition rate

(or other adverse inference rate), when unreasonable, from prevailing and to block

any temptation by Commerce to overreach reality in seeking to maximize

deterrence.").

While there is no threshold amount of information that is required to

corroborate a particular rate, the CIT has stated that as the selected rate reaches

"multiples of 100%, one might assume that a bit more corroboration or record

support is warranted." *Qingdao Taifa Group Co. v. United States*, 760 F. Supp. 2d

1379, 1386 (Ct. Int'l Trade 2010); *Lifestyle Enterprise, Inc. v. United States*, 768 F.

Supp. 2d 1286, 1298 (2011) (holding unreasonable Commerce's corroboration of

216.01% total AFA rate: "As the rate becomes larger and greatly exceeds the rates

of cooperating respondents, Commerce must provide a clearer explanation for its

choice and ample record support for its determination.").    Ultimately, in

corroborating an AFA rate, the Department must select a rate by balancing the

statutory objectives of finding an accurate dumping margin and inducing

compliance, rather than creating an overly punitive result." *Timken Co. v. United*

*States,* 354 F.3d 1334, 1345 (Fed. Cir. 2004).

<u>**NON-CONFIDENTIAL VERSION**</u>

### B.    THE DEPARTMENT FAILED TO OFFER ADEQUATE AND LAWFUL CORROBORATION FOR THE 112.81% PETITION RATE ASSIGNED TO THE PRC-WIDE ENTITY

As detailed below, Commerce failed to follow the statutory and court imposed guidelines for corroborating the AFA rate applied to the PRC-wide entity in this case.  The record shows that neither the AFA rate from the petition nor the information Commerce used for its corroboration were probative of the commercial reality during AR 4.  Furthermore, Commerce disregarded record evidence demonstrating the unreliability of the small group of sales data from the original investigation used for its corroboration.

### 1.    <u>The AFA Rate and Corroboration Information Commerce Used Are Outdated and Not Relevant to the Current Review Proceeding</u>

In its remand instructions directing Commerce to reconsider its initial corroboration of the AFA rate of 112.81% taken from the original petition, the trial court explicitly instructed Commerce to determine a PRC-wide rate for shrimp that 'is relevant, and <u>*not outdated*</u>."  *Ad Hoc Shrimp Trade Action Comm.,* 925 F. Supp. 2d at 1326 (emphasis added).  This instruction echoed one of the concerns expressed in the SAA regarding the reliance upon secondary information, stating that "{s}econdary information may not be entirely reliable because … it concerns a different time frame than the one at issue."  SAA at 870; s*ee also Ferro Union*, 23

CIT at 205 (emphasizing the importance of selecting an AFA rate that is current,

relevant and bearing a rational relationship to the respondent).

The concern over the use of outdated information is well founded because

the commercial reality for any industry never remains static.  Thus, even if certain

information reflected the commercial reality for an industry at one point in time,

there is no guarantee that it will continue to reflect commercial reality in the future.

*Id*.

Notwithstanding the trial court's clear instruction to avoid outdated

information, and the well-founded reasons for considering outdated information to

be of questionable reliability, Commerce continues to use a margin contained in

the 2003 petition for its AFA rate within this AR 4 proceeding.   To compound the

problem, Commerce also seeks to corroborate this AFA margin from the petition

with selected sales data from the original investigation.  In the context of AR 4,

both the AFA rate from the petition and the Red Garden sales data from the

investigation meet the definition of "secondary information" contained in both the

SAA and Commerce's regulations since the Red Garden sales data is derived from

a prior segment of the case conducted many years earlier.  Thus, Commerce seeks

to corroborate a form of secondary information (which the SAA notes may not be

reliable) with another form of secondary information that is equally outdated and

equally unreliable absent its own corroboration.

NON-CONFIDENTIAL VERSION

Put simply, this exercise defeats the plain intent of the statute's

corroboration requirement.  *See* SAA at 870.  Commerce and the trial court have

failed to explain how outdated information from the petition can be shown to be

probative and relevant to the commercial reality of the PRC shrimp industry within

AR 4 by reference to other outdated information from the original investigation.  If

this were an appeal of the first AR or the original investigation, a time in which

Commerce possessed far less information about calculated margin results, then

Commerce's corroboration analysis would have more legitimacy. However, as

discussed below, Commerce possessed a wealth of information from more recent

reviews (as well as recalculated margin results from the original investigation)

demonstrating that the 112.81% margin rate was not commercially reasonable.  In

light of the availability of this more recent information, Commerce's reliance upon

outdated information from the original investigation was unreasonable and

improper.  *See, e.g.*, *Lifestyle Enter. v. United States*, 768 F. Supp. 2d 1286, 1298

(Ct. Int'l Trade 2011), reversed on other grounds by *Lifestyle Enter. v. United*

*States*, 751 F.3d 1371 (Fed. Cir. 2014) ("indications that a rate may not reflect

commercial reality include significantly lower rates for cooperating respondents

and the presence of more recent, conflicting data.").

NON-CONFIDENTIAL VERSION

### 2. Commerce Improperly Ignored the Record Evidence of All Calculated Margins That Confirmed the 112.81% AFA Rate Was Aberrational

Commerce's assertion that the outdated AFA margin from the petition is corroborated by the equally outdated Red Garden sales data from the investigation is further undermined by the unbroken history of calculated margins that are, at best, a mere fraction of the 112.81% petition rate.   Having completed its recalculation of the margins from the original investigation pursuant to the *129 Proceeding* all mandatory respondents from the original investigation now have a calculated margin of zero or *de minimis*.  *Section 129 Determination*, 78 Fed. Reg. at 18,959.   Likewise, every mandatory respondent in ARs 1 through AR 4 that received a calculated rate received either a zero or *de minimis* margin, with the exception of one mandatory respondent in AR 3 who received a calculated margin of 9.08%.[16]   Thus, from the final investigation through AR 4, the highest dumping margin ever calculated by Commerce in this AD Order (and the _only_ calculated margin above *de minimis*) has been **9.08%**.   Given this history of extremely low margin results extending over multiple years, it is plainly evident that the 112.81% rate from the petition does not reflect commercial reality and is punitively high.

---

[16] *Third Administrative Review of Frozen Warmwater Shrimp From the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 74 Fed. Reg. 46,565, 46,568 (September 10, 2009).

In *Gallant Ocean*, this Court rejected a similar attempt by Commerce to apply an AFA rate based on a petition margin of 57.64% when all margins calculated by Commerce in the investigation and subsequent reviews demonstrated that such a high rate was not commercially reasonable:

> The fact that Commerce ultimately imposed dumping margins between 5.91% and 6.82% for the same products after its initial investigation shows the possession of better information and shows that the adjusted petition rate was aberrational. Cooperating respondents' actual dumping margins during the administrative review period--ranging from 2.58% to 10.75%--further call into question the credibility of the adjusted petition rate. The 57.64% adjusted petition rate is more than ten times higher than the average dumping margin for cooperating respondents. This high rate is also more than five times higher than the highest rate applied to a cooperating respondent. … Instead, the AFA rate is "punitive, aberrational, or uncorroborated," id., and excessive in view of the cooperative respondents' dumping rates. **This court also perceives that a rate over five times the highest rate imposed on similar products is far beyond an amount sufficient to deter Gallant and other uncooperative respondents from future non-compliance.**

*Gallant Ocean, 602 F.3d.* at 1323-24 (emphasis added).  Thus, in *Gallant Ocean* (a case involving the same warmwater frozen shrimp that are subject to this appeal), this Court expressly found that an AFA rate over <u>five times</u> the highest rate imposed on similar products was excessive and punitive.  Yet, in this case, Commerce is applying an AFA rate based on outdated and cherry-picked data that is over *<u>twelve times</u>* higher than the highest rate ever calculated for a cooperative

respondent. Application of such an AFA rate would directly conflict with the

Court's holding in *Gallant Ocean*. *Id*.

Moreover, the fact that Commerce has calculated so many dumping margins

well below the 112.81% petition rate demonstrates that Commerce was in

possession of better information to derive a reasonable AFA rate. *Id*.; *see also*

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1190 (Fed. Cir. 1990) (stating

that an adverse rate may be considered "punitive" if Commerce "had to reject low

margin information in favor of high margin information that was demonstrably less

probative of current conditions"). Commerce's choice of an AFA rate must be

supported by substantial evidence, and substantiality of the evidence must consider

information that both supports and contradicts Commerce's choice. *Gerald*

*Metals*, 132 F.3d at 720. Commerce cannot simply ignore more recent and

probative information indicating that its selected AFA rate is unreasonable and

punitive. *Rhone Poulenc,* 899 F.2d at 1190.

### 3.    The Small Percentage of Sales Data Used by Commerce Cannot Corroborate the Excessively High AFA Margin

Commerce's attempt to corroborate the petition AFA rate should also be

rejected given the very small percentage of sales data used in its corroboration. In

this instance, there is a very troubling disconnect between the reasoning offered by

Commerce and the trial court and the record evidence underlying Commerce's

corroboration analysis. Both Commerce and the trial court repeatedly note that the

CONNUM-specific margins utilized for the corroboration were for the "largest exporter of subject merchandise during the POI."  Slip Op 14-55 at 23 (**JA0000040**); Results at 34 (**JA0004066**).   These discussions minimize the fact that the CONNUM-specific margins relied upon comprise **only [2.24%] of Red Garden's sales data**.  *See* Red Garden Memo at 2 (**JA004027**).  Moreover, both Commerce and the trial court make scant mention of the fact that Red Garden's overall margin from the *129 Proceeding* was <u>zero</u>. *Section 129 Determination*, 78 Fed. Reg. at 18,959.  Thus, while Commerce claims that the selected sales data is probative of the pricing behavior and commercial reality for the PRC-wide entity, it does not even reflect the commercial reality of the company from which it was derived.  To the contrary, this limited segment of sales data is *directly misleading* with respect to the actual dumping margin assigned to Red Garden in the proceeding from which it was taken.

While both Commerce and the trial court cite cases in which a limited number of sales were accepted as corroboration for an AFA rate, the circumstances in the instant case do not support the use of such limited and cherry-picked data.  First, this Court noted in *Gallant Ocean* that a small percentage of transactions can only corroborate an AFA rate if the record shows that these transactions "represented a reasonably accurate estimate" of the actual dumping margin.  *Gallant Ocean* at 1325.  A small percentage of sales cannot be adequate

corroboration if Commerce does not show a reasonable "relationship between the small number of unusually high dumping transaction" and the actual rate the respondent might receive. *Id*. at 1324. Given the outdated nature of the Red Garden transactions Commerce has used for its corroboration, and the unbroken string of vastly lower margins calculated by Commerce in the investigation and all subsequent reviews, Commerce has failed to show that this small number if high margin transactions has any reasonable relationship with the commercial reality of AR 4. *Id*., *see also Dongguan Sunrise Furniture Co., Ltd. v. United States*, 904 F. Supp. 2d 1359, 1364 (Ct. Int'l Trade 2013) (stating that "{c}herry-picking the highest possible margins {above a certain percentage} does not satisfy Commerce's burden").

Furthermore, the CIT has noted that it is reasonable to assume that higher AFA margins warrant a higher level of corroboration. *See Dongguan Sunrise Furniture Co,. Ltd.*, 904 F. Supp. 2d at 1364 (stating that "a larger percentage of a party's sales is needed to support a very high margin in order for Commerce to be able to demonstrate that the sales relied on are representative of the respondent's commercial reality" ); *see also Qingdao Taifa*, 760 F. Supp. 2d at 1386 (presuming that a higher level of corroboration is warranted when the AFA rate reflects "multiples of 100%"). In this instance, Commerce has attempted to corroborate a

petition rate of 112.81% using a mere [2.24%] of outdated sales data from the

original investigation for a company that actually received a 0.00% rate.

Ultimately, in this case, the extremely limited sales data Commerce has

cherry-picked is not probative of Red Garden's actual dumping margin in 2003,

and is not probative of any other margin ever calculated in this case.  Under these

circumstances, these transactions and the petition rate cannot be probative of, or

used as a reasonably accurate estimate for, the PRC-wide entity's sales activity in

2009.

### C.    THE TRIAL COURT ERRED IN CONCLUDING THAT PREVIOUS CALCULATED RATES ARE IRRELEVANT TO THE CORROBORATION REQUIREMENT IN THIS CASE

In response to Hilltop's arguments that the 112.81% petition rate is outdated

and inconsistent with the history of calculated rates over the life of this

antidumping order, the trial court advanced a theory that the obligation to have

AFA rates reflect commercial reality is not applicable when the AFA rate is

applied to a country-wide entity:

> "But where (as here) the non-cooperating respondent is a NME countrywide entity – definitionally presumed to set prices without regard to market conditions - the actual pricing behavior of the cooperative respondents that have demonstrated eligibility for a separate rate . . .  does not bear upon the credibility of the dumping allegations against the NME countrywide entity in the way that pricing behavior of cooperative market economy respondents reflects on the

> credibility of dumping allegations against their similarly-situated market participates. … For while the pricing behavior of the cooperative respondents may be relevant to the commercial reality of non-cooperating exporters from a market economy . . . no analog exists in the NME context, where the countrywide government entity is presumed to act unimpeded by such forces. … In the NME context, therefore, the inference that the countrywide entity as a whole may be dumping at margins significantly above the cooperating separate rate market participants is not unreasonable

Slip Op. 14-55 at 29-30 (**JA0000046-47**).

However, there is no statutory language or case law to support this view that a separate (and more lenient) corroboration standard can be applied to a country-wide entity. To the contrary, a country-wide entity is a respondent entitled to the same treatment as any other respondent in the proceeding. There is no separate statutory authority for assigning an AFA rate to a country-wide entity. When Commerce applies an adverse inference rate to the country-wide entity, it cites to section 1677e as it would in any other circumstance. Consequently, the corroboration requirements of section 1677e(c) remain applicable when Commerce relies upon secondary information for its adverse inference.

While the courts have stated that an adverse country-wide rate does not need to be corroborated with respect to each particular respondent, these cases do not stand for the proposition that the corroboration requirement should be disregarded

**NON-CONFIDENTIAL VERSION**

or reduced when applied to a country-wide entity.[17] *See, e.g.*, *Peer Bearing Co. v. United States*, 587 F. Supp. 2d 1319, 1327 (Ct. Int'l Trade 2008) (stating that the PRC-wide rate "must be corroborated according to its reliability and relevance to the countrywide entity as a whole"); *Lifestyle Enter. v. United States*, 768 F. Supp. 2d at 1298, quoting *Qingdao Taifa Group Co. v. United States*, 760 F. Supp. 2d 1379 (Ct. Int'l Trade 2010) (stating that the dramatic increase of Orient's rate from 7.28% to the PRC-wide rate of 216.01% "raises the concern that '[t]here is little likelihood that in any real world this could be an approximation of an actual rate'" and requiring Commerce "to present substantial evidence that the new rate reflects commercial reality"); *Shandong Mach. Imp. & Exp. Co. v. United States*, 33 C.I.T. 810, 816 (2009), quoting Peer Bearing, 587 F. Supp. 2d at 1327    (finding that Commerce failed to comply with the corroboration requirements of section 1677e(c) when taking a PRC-wide rate from the petition and directing Commerce on remand "to assign a different rate to hammers/sledges that has been 'corroborated according to its reliability and relevance to the country-wide entity as a whole'").

---

[17] Furthermore, the trial court's assertion that NME status undermines the validity of U.S. sales data is mistaken. The non-market economy ("NME") methodology is contained in the statute as an alternative method for calculating normal value – not the net U.S. sales price. 19 U.S.C. § 1675b(c). Net U.S. price for NME respondents is still calculated using the actual sales prices reported for subject merchandise.

NON-CONFIDENTIAL VERSION

Accordingly, it is improper to dismiss the relevance of all rates assigned to respondents throughout the history of the PRC Shrimp Order because these rates are, collectively, the best indication of the commercial reality of the industry as a whole. In this instance, the massive discrepancy between the 112.81% rate and all the individual rates ever calculated by Commerce is a clear indication that the 112.81% rate derived from the petition does not reflect commercial reality and is an impermissibly punitive rate. *See Gallant Ocean*, 602 F.3d at 1323-34.

### D.    COMMERCE UNREASONABLY DENIED ACCESS TO INFORMATION DEMONSTRATING THE ABERRATIONAL NATURE OF THE CHERRY-PICKED RD GARDEN DATA

Finally, both the trial court and Commerce claim that the corroboration was reasonable, in part, because no party submitted evidence rebutting the reasonableness of the rate to this review.  Specifically, the trial court asserted that "Hilltop has presented no new evidence to suggest that the Petition-based countrywide rate, as corroborated using (appropriately recalculated) contemporaneous[18] data from the largest cooperating respondent during the POI, has lost its probative value."  Slip Op. 14-55 at 35 (**JA0000052**).   Further, the trial court noted that "neither the PRC-wide entity nor any other respondent has come

---

[18] The trial court's use of the term "contemporaneous" in this context is somewhat confusing here.  The Red Garden data was contemporaneous to the original investigation and to 2003 sales; it is not contemporaneous to sales made in 2009, the period of review that is the subject of this appeal.

NON-CONFIDENTIAL VERSION

forward with any more accurate information" suggesting that this rate is not reflective of the commercial reality of the PRC-wide entity. *Id*. The placement of the burden to produce corroborating evidence on Hilltop and other parties is improper and should be rejected.

The statutory requirement that the Department must corroborate secondary sources using "independent information" demonstrates that "the Department is not excused from its obligation to corroborate secondary information used to draw an adverse inference simply because the interested parties have placed no corroborative information on the record." *Foshan Shunde Yongjian Housewares & Hardware Co. v. United States*, 991 F. Supp. 2d 1322, 1329 (Ct. Int'l Trade 2014); *see also Washington Int'l Ins. Co. v. United States*, 2010 Ct. Intl. Trade LEXIS 13, *8, Slip Op. 10-16, at 5 n.3 (2010) (noting that "it may be opined that Congress intended Commerce to exert its utmost to remove doubt as to the reliability of any secondary information it would rely upon.").

In this case, Commerce selected an AFA rate from secondary information – the petition. Having made the choice to rely upon secondary information, the burden fell upon Commerce to corroborate this rate. *See Foshan Shunde*, 991 F. Supp. 2d at 1329  (stating that "Congress placed the obligation to corroborate secondary information using independent sources on the Department, not on the interested parties who are normally responsible for generating the administrative

NON-CONFIDENTIAL VERSION

record"). Rather than corroborate this information from "independent sources" as defined by its regulations,[19] Commerce attempted to corroborate that rate using other secondary information from a proceeding (*i.e.*, the original investigation) other than the current review.

Hilltop expressed a number of concerns regarding the outdated secondary information used by Commerce in its corroboration, but Commerce discounted these concerns because Hilltop did not submit any information on the record. In response to Hilltop's concern that the extremely wide range of CONNUM-specific margins for Red Garden indicates that its sales experience may not be typical, Commerce argues that "Hilltop has failed to provide any indication that a wide range of margins is atypical … nothing on the record of this review suggests that a wide range of margins would somehow be unusual." Remand at 43 (**JA0004075**). However, the reason why the record does not contain any additional information showing that Red Garden's wide range of margins is atypical is because Commerce refused Hilltop's request to provide additional margin data from other respondents. *See* Memo to File, Placing Section 129 Documents on the Record of the Fifth Administrative Review (Aug. 14, 2014) (**JA0003962-JA0004015**). This information constitutes business proprietary data from an earlier proceeding, so Hilltop had no independent ability to place this BPI data on the record.

---

[19] 19 C.F.R. § 351.308(d)

NON-CONFIDENTIAL VERSION

For the reasons outlined above, Commerce's revised attempt to corroborate the 112.81% petition rate fails to establish that it is a rate that reflects commercial reality in the current review. To the contrary, record evidence demonstrates that the 112.81% AFA rate is aberrational and punitive.

## CONCLUSION

For the reasons discussed above, Hilltop respectfully requests that the decision of the Court of International Trade be vacated with respect to the issues addressed herein and that the case be remanded to the Department of Commerce with instructions to implement the necessary corrections for these issues

Respectfully submitted,

_/s/ Mark E. Pardo_____

Mark E. Pardo
Andrew T. Schutz

GRUNFELD, DESIDERIO,
LEBOWITZ, SILVERMAN &
KLESTADT LLP

120 New York Ave., NW, Suite 650
Washington, DC 20005
202-783-6881

Dated: September 19, 2014

# CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of September, 2014, a copy of the foregoing **BRIEF OF PLAINTIFF-APPELLANT HILLTOP INTERNATIONAL (Non-confidential version ),** was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic-filing system. Parties may access this filing through the Court's system.


/s/Mark E. Pardo
Mark E. Pardo
*Counsel for Hilltop*

**NON-CONFIDENTIAL VERSION**

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 28.1(e)(2) and 32(a)(7)(B).

2. This brief contains 16,911 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

3. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6).

4. This brief has been prepared in a proportionally spaced type face using Word 2010 in Times New Roman 14 point font.

/s/Mark E. Pardo
Mark E. Pardo
*Counsel for Hilltop*

9074860_1

Slip Op. 14 - 55

UNITED STATES COURT OF INTERNATIONAL TRADE

```
┌─────────────────────────────────────────┐
│ AD HOC SHRIMP TRADE ACTION               │
│ COMMITTEE,                               │
│                                          │
│         Plaintiff,                       │
│                                          │
│              v.                          │
│                                          │
│ UNITED STATES,                           │
│                                          │
│         Defendant,                       │
│                                          │
│              and                         │
│                                          │
│ HILLTOP INTERNATIONAL and OCEAN          │
│ DUKE CORP.,                              │
│                                          │
│         Defendant-Intervenors.           │
└─────────────────────────────────────────┘
```

**PUBLIC VERSION**

Before: Donald C. Pogue,
        Chief Judge

Court No. 10-00275
Court No. 11-00335

OPINION

[affirming two remand redeterminations]

Dated: May 20, 2014

Andrew W. Kentz, Jordan Charles Kahn, Nathaniel
Maandig Rickard and Nathan W. Cunningham, Picard Kentz & Rowe
LLP, of Washington, DC, for the Plaintiff.

Joshua E. Kurland, Trial Attorney, Commercial
Litigation Branch, Civil Division, U.S. Department of Justice,
of Washington, DC, for the Defendant.  With him on the briefs
were Stuart Delery, Assistant Attorney General, Jeanne E.
Davidson, Director, and Patricia M. McCarthy, Assistant
Director.  Of counsel on the briefs was Melissa M. Brewer,
Attorney, Office of the Chief Counsel for Trade Enforcement and
Compliance, U.S. Department of Commerce, of Washington, DC.

Mark E. Pardo and Andrew T. Schutz, Grunfeld,
Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington,
DC, for the Defendant-Intervenors.

**Pogue, Chief Judge:**  This opinion addresses litigation arising out of the fourth and fifth administrative reviews of an antidumping duty order covering certain warmwater shrimp from the People's Republic of China ("PRC" or "China").  During the subsequent sixth administrative review of this order, Commerce found that respondent Hilltop International ("Hilltop") had made material misrepresentations regarding its affiliations and corporate structure throughout the entire history of the order.[1] At the time of this finding, liquidation of entries covered by the fourth and fifth administrative reviews remained enjoined pending the final outcome of judicial review.[2]  Concluding that the evidence of Hilltop's misconduct was equally applicable to the fourth and fifth reviews, Commerce requested and was granted permission to reopen the records of those reviews in order to consider the effect of this new evidence on Hilltop's calculated dumping margins.[3]  Hilltop now challenges the results of

---

[1] See Issues & Decision Mem., A-570-893, ARP 10-11 (Aug. 27, 2012) accompanying Certain Frozen Warmwater Shrimp from the People's Republic of China, 77 Fed. Reg. 53,856 (Dep't Commerce Sept. 4, 2012) (final results, partial rescission of sixth antidumping duty administrative review and determination not to revoke in part) ("AR6 I & D Mem.") cmt. 1 at 12-17.

[2] See Order Granting Consent Mot. Prelim. Inj., Ct. No. 10-00275, ECF No. 11; Order Granting Consent Mot. Prelim. Inj., Ct. No. 11-00335, ECF No. 10.

[3] See Order Remanding Certain Frozen Warmwater Shrimp from the People's Republic of China, 75 Fed. Reg. 49,460 (Dep't Commerce
(footnote continued)

Commerce's redeterminations.[4]

The court has jurisdiction pursuant to
Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as
amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006),[5] and 28 U.S.C.
§ 1581(c) (2006).

As explained below, Commerce's reasonable
determination not to rely on Hilltop's representations, and to
therefore treat Hilltop as part of the PRC-wide entity in the
fourth review, is sustained on the same grounds as those
supporting the affirmance of Commerce's essentially identical

---

Aug. 13, 2010) (final results and partial rescission of
antidumping duty administrative review) ("AR4 Final Results")
and accompanying Issues & Decision Mem., A-570-893, ARP 08-09
(Aug. 9, 2010) ("AR4 I & D Mem."), Ct. No. 10-00275, ECF No. 71;
Order Granting Mot. Expand Scope of Remand of Certain Frozen
Warmwater Shrimp from the People's Republic of China, 76 Fed.
Reg. 51,940 (Dep't Commerce Aug. 19, 2011) (final results and
partial rescission of antidumping duty administrative review)
("AR5 Final Results") and accompanying Issues & Decision Mem.,
A-570-893, ARP 09-10 (Aug. 12, 2011) ("AR5 I & D Mem."),
Ct. No. 11-00335, ECF No. 70.

[4] Because Hilltop's challenges to the (revisited) fourth and
fifth reviews present identical legal issues, as applied to
essentially identical facts, this single opinion is addressed to
both legal actions.  A third action, challenging essentially
identical determinations in the sixth administrative review, has
been stayed pending the final outcome of any appeals from this
decision. See Order Apr. 23, 2014, Ct. No. 12-00289, ECF No. 80.

[5] Further citations to the Tariff Act of 1930, as amended, are to
the relevant provisions of Title 19 of the U.S. Code,
2006 edition.

determination in the (revisited) fifth review.[6]  In addition,
Commerce's corroboration analysis, supporting the use of the
112.81 percent countrywide rate in the revised results of the
fourth and fifth reviews, is also sustained.

### PROCEDURAL BACKGROUND

Because the results of the fifth review were already
being reconsidered pursuant to remand at the time that new
evidence of Hilltop's misconduct came to light during the sixth
review, Commerce's decision regarding the effect of this new
evidence on Hilltop's margin calculations came to court first on
the (reopened) record of the fifth review.  Reexamining this
supplemented record, Commerce determined that Hilltop had
misrepresented information regarding the scope of its affiliates
and corporate structure, and moreover that the circumstances of
these misrepresentations – in particular Hilltop's failure to
provide a persuasive explanation for the material errors, as
well as its refusal to answer Commerce's follow-up questions
regarding potential as-yet undisclosed affiliates – were such
that Hilltop's remaining representations regarding corporate
ownership and control were not reliable.[7]  Because Commerce had

---

[6] See Ad Hoc Shrimp Trade Action Committee v. United States,
__ CIT __, 925 F. Supp. 2d 1315, 1319-24 (2013) ("Ad Hoc II").

[7] See Ad Hoc II, __ CIT __, 925 F. Supp. 2d at 1318-19
                                        (footnote continued)

initially granted Hilltop separate rate status based solely on

these no longer reliable representations, it accordingly

determined that Hilltop had failed to submit reliable evidence

to rebut the presumption of government control attaching to all

exporters covered by this antidumping duty order.[8]  Commerce

consequently assigned to Hilltop the 112.81 percent countrywide

rate, which was derived from the petition to initiate these

proceedings (the "Petition") and last corroborated during

Commerce's initial investigation into unfair pricing (the less

than fair value or "LTFV" investigation).[9]

      Commerce's unreliability determination and decision in

the fifth review to assign the PRC-wide rate to Hilltop were

affirmed on judicial review.[10]  However, Commerce's (re-

---

(discussing Final Results of Redetermination Pursuant to Court
Remand, Ct. No. 11-00335, ECF No. 74 ("AR5 1st Remand
Results")).

[8] Ad Hoc II, __ CIT __, 925 F. Supp. 2d at 1318-19, 1322-24.
Commerce presumes that all exporters from non-market economy
("NME") countries like China operate under government control
and hence requires respondents to submit reliable evidence to
the contrary in order to receive an antidumping duty rate that
is separate from the countrywide entity ("separate rate
status"). Transcom, Inc. v. United States, 294 F.3d 1371, 1373
(Fed. Cir. 2002) (citing Sigma Corp. v. United States, 117 F.3d
1401 (Fed. Cir. 1997) (affirming this practice)).

[9] Ad Hoc II, __ CIT __, 925 F. Supp. 2d at 1318-19, 1324-25.

[10] Id. at 1324 (sustaining Commerce's determination to deny
separate rate status to Hilltop in the fifth review).

determined) results of the fifth review were remanded for

reconsideration of the corroboration analysis Commerce used to

satisfy itself that the countrywide rate derived from the

Petition had probative value with respect to the likely pricing

behavior of the non-cooperating PRC-wide entity.[11]  Commerce then

revisited its corroboration analysis, the results of which are

one of the matters now before the court.[12]

          Meanwhile, the (revisited) results of the fourth

review – wherein Commerce made essentially identical findings

and conclusions with respect to Hilltop, based on identical

evidence, as it did in the (revisited) fifth review – are also

before the court.[13]  In its redetermination of Hilltop's

antidumping duty assessment rate in the fourth review, Commerce

also revisited its corroboration of the countrywide rate, which

---

[11]  Id. at 1326-27. See 19 U.S.C. 1677e(c) (requiring Commerce to
"corroborate" "secondary information," defined as "information
[other than that] obtained in the course of an investigation or
review"); Statement of Administrative Action accompanying the
Uruguay Round Agreements Act, H.R. Doc. No. 103-316 (1994)
("SAA") at 870 (explaining that "secondary information" includes
"information derived from the petition that gave rise to the
[LTFV] investigation or [subsequent administrative] review," and
further explaining that "corroboration" within the meaning of
Section 1677e(c) requires that Commerce satisfy itself of the
information's "probative value").

[12] See Results of Redetermination Pursuant to Court Remand,
Ct. No. 11-00335, ECF No. 106-1 ("AR5 2d Remand Results").

[13] See Final Results of Redetermination Pursuant to Court Remand,
Ct. No. 10-00275, ECF No. 77-1 ("AR4 Remand Results").

it assigned to Hilltop also in that revisited review.  This

corroboration analysis (as well as the countrywide rate itself)

is identical to that employed pursuant to remand of the results

of the fifth review.[14]  Hilltop now challenges Commerce's

unreliability determination and decision to assign to Hilltop

the PRC-wide rate in the fourth review, as well as Commerce's

corroboration analysis for the countrywide rate in both the

(revisited) fourth and fifth reviews.[15]

## STANDARD OF REVIEW

The court will sustain Commerce's antidumping

determinations, including redeterminations made pursuant to

remand, so long as such determinations are supported by

substantial evidence, are otherwise in accordance with law and,

in the case of redeterminations, are consistent with the court's

remand order. See 19 U.S.C. § 1516a(b)(1)(B)(i); Trust Chem Co.

v. United States, __ CIT __, 819 F. Supp. 2d 1373, 1378 (2012).

Substantial evidence refers to "such relevant evidence as a

reasonable mind might accept as adequate to support a

conclusion," SKF USA, Inc. v. United States, 537 F.3d 1373, 1378

---

[14] Compare AR4 Remand Results at 29-34, with AR5 2d Remand
Results at 3-7.

[15] Def.-Intervenors' Comments in Opp'n to Final Remand Results,
Ct. No. 10-00275, ECF No. 83 ("Hilltop's AR4 Br."); Def.-
Intervenors' Comments in Opp'n to Final Remand Results,
Ct. No. 11-00335, ECF No. 110 ("Hilltop's AR5 Br.").

(Fed. Cir. 2008) (quoting Consol. Edison Co. v. NLRB, 305 U.S.

197, 229 (1938) (defining "substantial evidence")), and the

substantial evidence standard of review can be roughly

translated to mean "is the determination unreasonable?" Nippon

Steel Corp. v. United States, 458 F.3d 1345, 1351

(Fed. Cir. 2006) (internal quotation and alteration marks and

citation omitted).  "The specific determination we make is

whether the evidence and reasonable inferences from the record

support" Commerce's findings. Daewoo Elecs. Co. v. United

States, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (internal quotation

marks and citation omitted).

**DISCUSSION**

I. Context

         In initiating each of these reviews, Commerce

reiterated its policy of assigning to all exporters and

producers from NME countries – including China – a single

countrywide antidumping duty rate unless respondents qualify for

"separate rate status" by affirmatively demonstrating freedom

from government control over export activities.[16]  Also in each

---

[16] See Certain Frozen Warmwater Shrimp from the Socialist
Republic of Vietnam and the People's Republic of China, 74 Fed.
Reg. 13,178, 13,178-79 (Dep't Commerce Mar. 26, 2009) (notice of
initiation of administrative reviews and requests for revocation
in part); Certain Frozen Warmwater Shrimp from the Socialist
Republic of Vietnam and the People's Republic of China, 75 Fed.
(footnote continued)

review, Commerce preliminarily granted Hilltop separate rate

status based on Hilltop's representations that it is located in

Hong Kong (which is treated as a market economy) and that

neither it nor any of its Chinese affiliates are controlled by

any government entity.[17]

        Subsequently, however, in the course of the sixth

administrative review, Commerce discovered that Hilltop's part

owner and general manager (To Kam Keung or "Mr. To") had

incorporated, invested significant funds in, and served on the

board of an undisclosed Cambodian affiliate (Ocean King

(Cambodia) Company Limited or "Ocean King").  Hilltop had

repeatedly certified the contrary to Commerce throughout the

prior history of this antidumping duty order.  Not only did

Hilltop fail to disclose this affiliation in its initial

responses to Commerce's inquiries in all segments of this

antidumping proceeding, but Hilltop then also explicitly denied

---

Reg. 18,154, 18,154-55 (Dep't Commerce Apr. 9, 2010) (notice of
initiation of administrative reviews and requests for revocation
in part). See also supra note 8.

[17] See Certain Frozen Warmwater Shrimp from the People's Republic
of China, 75 Fed. Reg. 11,855, 11,858-59 (Dep't Commerce
Mar. 12, 2010) (preliminary results, preliminary partial
rescission of antidumping duty administrative review and intent
to revoke, in part) ("AR4 Prelim. Results"); Certain Frozen
Warmwater Shrimp from the People's Republic of China, 76 Fed.
Reg. 8338, 8341 (Dep't Commerce Feb. 14, 2011) (preliminary
results and preliminary partial rescission of fifth antidumping
duty administrative review) ("AR5 Prelim. Results").

the affiliation's existence when questioned specifically about
Ocean King on multiple occasions.  Only after Commerce obtained
and placed on the record public registration documents showing
Mr. To to have incorporated and invested large sums in Ocean
King did Hilltop concede that, contrary to Mr. To's repeated
affirmations denying any knowledge of an affiliation with or
investment in Ocean King, Hilltop was in fact affiliated with
Ocean King throughout the history of this order.[18]

        Hilltop provided no explanation of its failure to
disclose and subsequent repeated denial of its affiliation with
Ocean King beyond a vague statement that the error may have been
due to Mr. To's lack of personal involvement with Ocean King
(despite unequivocal record evidence of his personal involvement
and substantial investment during Ocean King's incorporation),
"or for whatever reason."[19]  Moreover, beyond admitting that

---

[18] See AR6 I & D Mem. at 3-6; AR5 1st Remand Results at 11-13
(relying on Hilltop's representations during the fifth review
and the new evidence from the sixth review); AR4 Remand Results
at 11-13 (relying on Hilltop's representations during the fourth
review and the new evidence from the sixth review). See also Ad
Hoc II, __ CIT __, 925 F. Supp. 2d at 1318, 1321-24 (discussing
the evidence, first placed on record during the sixth review,
that was subsequently added to the record of the fifth (as well
as the fourth) review).

[19] See AR6 I & D Mem. cmt. 1 at 16 (quoting Hilltop's
representation during the sixth review); AR5 1st Remand Results
at 19 (same); AR4 Remand Results at 20 (same). See also Ad Hoc
II, __ CIT __, 925 F. Supp. 2d at 1323 (discussing this
evidence).

which was irrefutably demonstrated by the record evidence,

Hilltop refused to respond to Commerce's follow-up inquiries

regarding possible additional undisclosed affiliations.[20]

In all three administrative review proceedings,

Commerce determined that the circumstances of Hilltop's non-

disclosure, outright denial, and ultimate admission to an

undisclosed affiliation with Ocean King were such that the

agency could no longer rely on Hilltop's prior representations

regarding its corporate structure and freedom from government

control, the accuracy of which had been certified by the same

Mr. To whose credibility was impeached when the record revealed

his personal involvement with Ocean King despite having

repeatedly sworn the contrary to Commerce.[21]  Having found the

representations that had formed the basis for Hilltop's separate

rate status to be undermined, Commerce decided that Hilltop had

failed to affirmatively demonstrate its eligibility for a

separate rate and therefore assigned to Hilltop the countrywide

rate in each of these proceedings. Id.

---

[20] See AR6 I & D Mem. cmt. 1 at 17 & n.80, 18 & n.85; AR5 Remand
Results at 8, 21 & n.83, 44-47; AR4 Remand Results at 8, 21-24.
See also Ad Hoc II, __ CIT __, 925 F. Supp. 2d at 1323 & n.35
(discussing the evidence).

[21] See AR6 I & D Mem. cmt. 1 at 16-17; AR5 1st Remand Results
at 17-22 (relying on the new evidence from the sixth review);
AR4 Remand Results at 17-26 (same).

II.   Commerce's Determination to Assign to Hilltop the
      Countrywide Rate in the Fourth and Fifth Reviews

        Commerce may disregard deficient submissions and "use

the facts otherwise available" when a respondent withholds

requested information or otherwise significantly impedes the

administrative review and fails to either explain or adequately

remedy the deficiency. 19 U.S.C. §§ 1677e(a)(2), 1677m(d);

Jiangsu Changbao Steel Tube Co. v. United States, __ CIT __,

884 F. Supp. 2d 1295, 1302 (2012).  Here, Commerce found that

Hilltop's representations regarding its corporate structure,

ownership, and control were deficient because they contained

false information, which Hilltop repeatedly refused to correct

until faced with irrefutable evidence to the contrary.[22]  Because

Hilltop failed to persuasively explain the circumstances

surrounding, or its motivation for, withholding not only that

information to which it was ultimately forced to admit but also

additional requested information regarding its corporate

structure and ownership, Commerce determined to disregard

Hilltop's remaining representations concerning its ownership and

control as unreliable. Id.

        In the absence of a reliable affirmative demonstration

of freedom from government control through Hilltop's disclosed

---

[22] See *supra* note 18. See also AR6 I & D Mem. cmt. 1 at 12-17;
AR5 Remand Results at 16-22; AR4 Remand Results at 16-26.

and possibly additional undisclosed Chinese affiliates,[23]

Commerce presumed – as it does with respect to all NME

respondents who fail to demonstrate freedom from government

control[24] – that Hilltop was part of the countrywide entity.[25]

In its challenge, Hilltop argues, first, that Commerce

improperly disregarded those of Hilltop's representations that

formed the basis for its separate rate status in the fourth

review[26] because Hilltop's non-disclosure of an affiliation with

Ocean King was immaterial, asserting that Ocean King was not

involved in the production of subject merchandise during the

POR.[27]  Although record evidence indicates that Ocean King was

likely involved in the repackaging and re-export of shrimp

subject to U.S. antidumping duties,[28] suggesting at least the

---

[23] See *supra* note 20 (citing to Commerce's discussion of
Hilltop's refusal to respond to the agency's follow-up inquiries
regarding possible additional undisclosed affiliations).

[24] See *supra* note 8.

[25] See *supra* note 21.

[26] Note that Commerce's decision to disregard the representations
that had formed the basis for Hilltop's separate rate status in
the fifth review was sustained in Ad Hoc II, __ CIT __,
925 F. Supp. 2d at 1324.

[27] See Hilltop's AR4 Br. at 7-20.

[28] See, e.g., Ex. 1 to Ad Hoc Shrimp Trade Action Committee's
Comments on [Commerce's] Preliminary Determination to Grant
Hilltop's Request for Company-Specific Revocation Pursuant to
19 C.F.R. 351.222(b)(2) and Comments in Anticipation of
Hilltop's Forthcoming Verification, A-570-893, ARP 10-11
                                              (footnote continued)

possibility of additional undisclosed involvement in the

production and sale of subject merchandise, Commerce did not

make (and need not have made) a finding that Ocean King was in

fact so involved.  Contrary to Hilltop's characterizations,

Commerce's decision to invalidate Hilltop's separate rate

representations as unreliable was not based on a definitive

finding of transshipment, but rather on the impeachment of

Hilltop's credibility as a consequence of evidence reasonably

indicating that Hilltop deliberately withheld and misrepresented

information requested of it, which misrepresentation may

reasonably be inferred to pervade the data in the record beyond

that which Commerce has positively confirmed as misrepresented.[29]

Thus the material information that Commerce ultimately

found to be missing from the record was a reliably accurate

---

(Mar. 12, 2012), reproduced in, e.g., App. of Docs. Supporting
Def.'s Resp. Comments Regarding Remand Results,
Ct. No. 10-00275, ECF No. 110-4 at Tab 9, at Attachs. 14
(internal emails discussing whether shrimp sent to Ocean King
from the Socialist Republic of Vietnam (which, like the subject
merchandise from China, were also subject to U.S. antidumping
proceedings) should "reuse all white cartons of Vietnam and
stick MC labels in Cambodia" or instead "print new master
cartons for Cambodia origin products" rather than "sticker[ing]
over Product of Vietnam cartons"), 19 (internal email in which
Mr. To discusses Ocean King's establishment) and 20 (internal
email cautioning Mr. To that Hilltop's predecessor-in-interest
"cannot have any Involve [sic] or any paper related! [to Ocean
King]").

[29] See supra note 18.

representation of Hilltop's corporate structure and the extent

of government control potentially exercised through its Chinese

affiliates.[30]   Because the accuracy of all representations in

this regard was certified by Mr. To, who also certified the

accuracy of repeated false statements in response to direct

inquiries regarding Ocean King, Commerce reasonably discredited

these representations as unreliable.[31]   Commerce repeatedly

requested Hilltop to provide information specifically about its

affiliation with Ocean King, which Hilltop repeatedly falsely

---

[30] See *supra* note 22.

[31] See AR6 I & D Mem. cmt. 1 at 12. ("Because Hilltop repeatedly
made material misrepresentations with regard to its
affiliations, while certifying to the accuracy of such false
information, and because Hilltop refused our repeated requests
for information that was relevant to our analysis, we find that
we cannot rely on any of the information submitted by Hilltop in
this review."); AR5 1st Remand Results at 23-24 (same);
AR4 Remand Results at 28 (same). Cf. Changbao, __ CIT at __,
884 F. Supp. 2d at 1309 (holding that, to the extent that a
respondent's submissions contain solely representations made by
that respondent, the conclusion that such representations are
unreliable follows logically from Commerce's finding that the
company officer(s) who certified the accuracy of such
representations were themselves unreliable sources of truthful
and accurate information).
     While Hilltop emphasizes independent record evidence that
it is registered in Hong Kong, see, e.g., Hilltop's AR4 Br.
at 24-33 (relying on evidence of Hilltop's Hong Kong Business
License and Hilltop's Hong Kong Business Registration Form),
Hilltop's registration in Hong Kong is not in itself dispositive
because it does not address the potential for government control
through Hilltop's disclosed and possibly additional undisclosed
PRC affiliates. Ad Hoc II __ CIT at __, 925 F. Supp. 2d at 1324
n.39.

denied.[32]  The material information that was withheld, therefore,

is not merely the undisclosed affiliation with Ocean King, but

also all other complete and accurate information which Hilltop

failed to provide in response to Commerce's repeated attempts at

clarification until Hilltop finally was faced with irrefutable

evidence to the contrary.[33]

Similarly, Hilltop also argues that Commerce

improperly discredited the totality of Hilltop's representations

regarding corporate ownership and government control based on

Hilltop's concealment of an affiliation with Ocean King because

this affiliation did not concern a "core," rather than purely

"tangential," area of Commerce's antidumping analysis.[34]  But

---

[32] See AR6 I & D Mem. at 3-4; see also supra note 18.

[33] Cf. Changbao, ___ CIT at ___, 884 F. Supp. 2d at 1306 ("It is
reasonable for Commerce to infer that a respondent who admits to
having intentionally deceived Commerce officials, and does so
only after Commerce itself supplies contradictory evidence,
exhibits behavior suggestive of a general willingness and
ability to deceive and cover up the deception until exposure
becomes absolutely necessary. . . .  [I]n the absence of
additional reassurance or an explanation sufficient to
rehabilitate [the respondent]'s damaged credibility, Commerce
ha[s] no way of knowing whether or not [the respondent] may have
been less than straightforward with regard also to its remaining
submissions and representations . . . .").

[34] Hilltop's AR4 Br. at 20-24 (relying on Shanghai Taoen Int'l
Trading Co. v. United States, 29 CIT 189, 199 n.13, 360 F. Supp.
2d 1339, 1348 n.13 (2005); Foshan Shunde Yongjian Housewares &
Hardware Co. v. United States, No. 10-00059, 2011 WL 4829947
(CIT Oct. 12, 2011)). See Shanghai Taoen, 29 CIT at 199 n.13,
360 F. Supp. 2d at 1348 n.13 (holding that where Commerce finds
                                            (footnote continued)

again, this is not a case of inadvertent omission of tangential

information.  Hilltop did not merely omit an affiliation in its

initial accounting to Commerce.  First, Hilltop misrepresented

its corporate structure – stating that none of its managers held

any positions or investments in any undisclosed firm when its

part owner and general manager was in fact a board member and

shareholder at Ocean King, an undisclosed affiliate.[35]  And then

Hilltop additionally and explicitly denied numerous subsequent

inquiries regarding this undisclosed affiliation, repeatedly

certifying to Commerce that it had no additional affiliations,

and even specifically stating that "Hilltop is not affiliated

with Ocean King" and that "neither the company, nor its owners

or officers, invested any funds in Ocean King."[36]  In reality, as

---

a respondent to be not credible with regard to "core, not
tangential" information, the agency may reasonably disregard the
totality of information submitted by the discredited respondent
because "there is little room for substitution of partial
facts"); Foshan, 2011 WL 4829947 at *14 (holding that Commerce
reasonably determined to disregard the entirety of a
respondent's factors of production and sales information where
inaccuracies with respect to "core, not tangential" information
pervaded the respondent's responses to Commerce's inquiries)
(quoting Since Hardware (Guangzhou) Co. v. United States,
No. 09-00123, 2010 WL 3982277, at *7 (CIT Sept. 27, 2010)
(quoting Shanghai Taoen, 29 CIT at 199 n.13, 360 F. Supp. 2d at
1348 n.13)).

[35] See supra note 18.

[36] Hilltop's Reply to Pet'rs' Resp. to CBP Import Data,
A-570-893, ARP 10-11 (May 31, 2012) at 6, reproduced in, e.g.,
Public App. to Pl. Ad Hoc Shrimp Trade Action Committee's Reply
                                              (footnote continued)

Hilltop was eventually forced to admit, Hilltop's part owner and general manager – the same person who certified the accuracy of all of Hilltop's submissions in these reviews[37] – was both a board member and substantial shareholder in Ocean King during all three periods of review.[38]

Also contrary to Hilltop's contentions, the Cambodian location of Ocean King and Commerce's silence regarding whether there were any entries of shrimp from Cambodia during the relevant time periods do not make Hilltop's false statements "tangential" rather than "core."  What places Hilltop's false statements at the core of Commerce's analysis is that Mr. To repeatedly certified the accuracy of Hilltop's representations regarding its corporate structure while either knowing that these representations were false or else exhibiting gross negligence in failing to keep himself informed as to the nature and extent of his company's affiliations.  Whether through fraudulent concealment of the truth or through negligent inability to be informed of the relevant facts, Mr. To's certifications regarding the accuracy of the corporate structure

---

to Comments on Final Results of Redetermination Pursuant to Ct. Remand, Ct. No. 10-00275, ECF No. 108-1 at Tab 12.

[37] See AR6 I & D Mem. cmt. 1 at 16; AR5 1st Remand Results at 19-20; AR4 Remand Results at 20.

[38] See supra note 18.

represented in the submissions whose accuracy he certified are
no longer reliable.  Rather than reflecting a tangential matter,
these circumstances clearly concern the core of the accuracy and
reliability of Hilltop's remaining statements to Commerce
regarding its corporate structure, which had formed the basis
for Commerce's preliminary separate rate determinations.[39]
Having discredited these statements as unreliable, Commerce
reasonably concluded that the record presented no reliable
evidence of Hilltop's freedom from presumed government control
and therefore reasonably assigned Hilltop the countrywide rate.
See Transcom, 294 F.3d at 1373; Changbao, __ CIT at __,
884 F. Supp. 2d at 1309-12.

        Accordingly, Commerce's determination to assign to
Hilltop the PRC-wide antidumping duty assessment rate in the
fourth review is sustained on the same grounds as those
supporting the court's affirmance of Commerce's identical
determination in the revised results of the fifth review. See Ad
Hoc II, __ CIT __, 925 F. Supp. 2d at 1319-24.

III. Corroboration of the PRC-wide Rate Assigned to Hilltop in
        the Fourth and Fifth Reviews

        A. AR5 Remand Order

        Although the court sustained Commerce's decision to

---

[39] See supra note 17.

apply the countrywide rate to Hilltop in the fifth review,

Commerce's corroboration of this PRC-wide rate – which had

initially been based on data from the LTFV investigation and, in

the absence of evidence rebutting the presumption of continued

validity, see KYD, Inc. v. United States, 607 F.3d 760, 767

(Fed. Cir. 2010)[40], carried over into every subsequent review –

was remanded because the margin calculations on which Commerce's

original corroboration was based were subsequently altered

pursuant to judicial review, ultimately reducing the comparison

margins. See Ad Hoc II, __ CIT at __, 925 F. Supp. 2d at 1325-

27.  The court required that, "[o]n remand, Commerce must either

adequately corroborate the 112.81 percent rate and explain how

---

[40] (discussing "[t]he presumption that a prior dumping margin
imposed against an exporter in an earlier administrative review
continues to be valid if the exporter fails to cooperate in a
subsequent administrative review"); see also id. at 766
("Commerce is permitted to use a 'common sense inference that
the highest prior margin is the most probative evidence of
current margins because, if it were not so, the importer,
knowing of the rule, would have produced current information
showing the margin to be less.'") (quoting Rhone Poulenc, Inc.
v. United States, 899 F.2d 1185, 1190 (Fed. Cir. 1990) (emphasis
in original)) (also quoting Ta Chen Stainless Steel Pipe, Inc.
v. United States, 298 F.3d 1330, 1339 (Fed. Cir. 2002) ("In
cases in which the respondent fails to provide Commerce with the
most recent pricing data, it is within Commerce's discretion to
presume that the highest prior margin reflects the current
margins.")); AR4 Prelim. Results, 75 Fed. Reg. at 11,859 ("For
the China-wide entity, we have assigned the entity's current
rate and the only rate ever determined for the entity in this
proceeding.") (unchanged in AR4 Final Results, 75 Fed. Reg. at
49,463); AR5 Prelim. Results, 76 Fed. Reg. at 8342 (same)
(unchanged in AR5 Final Results, 76 Fed. Reg. at 51,942).

its corroboration satisfies the requirements of 19 U.S.C.

1677e(c), or else calculate or choose a different countrywide

rate that better reflects commercial reality, as supported by a

reasonable reading of the record evidence." Id. at 1327.

> B. *The Corroboration Analysis in the AR5 2d Remand
> Results and AR4 Remand Results*

In its remand proceedings concerning the fourth and

fifth reviews, Commerce revisited its corroboration of the PRC-

wide rate. Acknowledging that the margins used to initially

corroborate this rate in the LTFV investigation (which

corroboration analysis was then relied upon in all subsequent

reviews) were altered following judicial review, Commerce

employed record data that were recalculated to reflect any

changes that were made pursuant to litigation. AR5 2d Remand

Results at 8; AR4 Remand Results at 35.[41] Specifically, Commerce

employed a file that was created in connection with a recent

Section 129 proceeding,[42] implementing the outcome of dispute

---

[41] The data were also recalculated "to allow offsets for non-dumped sales," pursuant to the outcome of dispute settlement before the World Trade Organization's ("WTO") Dispute Settlement Body ("DSB"). Id.

[42] "Section 129" refers to proceedings undertaken in response to a decision by the WTO's DSB that some particular determination by a U.S. trade agency was not consistent with the United States' obligations as a Member of the WTO's Antidumping and/or Subsidies and Countervailing Measures Agreements. See 19 U.S.C. § 3538(b); see generally Andaman Seafood Co. v. United States, __ CIT __, 675 F. Supp. 2d 1363, 1370-72 (2010) (discussing the
(footnote continued)

settlement proceedings at the WTO.  This file (the "Red Garden

Margin File") lists every CONNUM-specific margin[43] calculated for

Shantou Red Garden Foodstuff Company ("Red Garden"), who was a

mandatory respondent in the LTFV investigation and sold the

highest volume of sales during the period of investigation

("POI").[44]  But while the Red Garden Margin File was created

using the data submitted by Red Garden in the LTFV

investigation, the CONNUM-specific margin calculations reflect

the adjustments necessitated by judicial review.[45]

    Analyzing these CONNUM-specific margins for the

---

mechanism and legal effect of Section 129 proceedings).

[43] In antidumping proceedings, different control numbers
("CONNUMs") are used "to identify the individual models of
products for matching purposes." AR5 2d Remand Results at 5
n.18.  "Identical products are assigned the same CONNUM in both
the comparison market sales database (or in a non-market economy
context, the factors of production database) and U.S. sales
database." Id. (citing Ch. 4 of the Antidumping Manual
(Oct. 13, 2009) at 10).  "CONNUM-specific margins result in
calculated margins that represent the pricing behavior related
to groups of sales," grouped by model type. Id. at 13.

[44] Although Commerce had previously stated that a different
respondent had sold the highest volume of subject merchandise
during the POI, Commerce has revisited the evidence and
determined that in fact Red Garden had the highest volume of
sales during the POI. AR5 2d Remand Results at 6 n.22.  No party
challenges this determination.

[45] See AR5 2d Remand Results at 8; AR4 Remand Results at 35;
Ad Hoc II, __ CIT __, 925 F. Supp. 2d at 1326 (discussing the
legal actions that ultimately resulted in revisions to the
dumping margins initially calculated by Commerce in the LTFV
investigation).

largest exporter of subject merchandise during the POI,[46]

Commerce found that, "despite the reduction of calculated

weighted-average margins subsequent to litigation, a significant

quantity and value of CONNUM-specific margins higher than

[112.81 percent] remain for at least one respondent [i.e., Red

Garden]." AR5 2d Remand Results at 13; AR4 Remand Results at 40.

Specifically, Commerce found that "more than half of the CONNUMs

examined in Red Garden's margin calculation had positive margins

[and,] [o]f those CONNUMs with positive margins, . . . the

percentage with dumping margins exceeding 112.81 percent[[47]] is

sufficient to demonstrate the probative value of the lowest

Petition margin of 112.81 percent." AR5 2d Remand Results

at 6-7; AR4 Remand Results at 34.  In addition, Commerce found

that, by quantity, "CONNUMs accounting for a significant volume

of merchandise under consideration were sold at prices that

---

[46] In addition to being the largest exporter of subject
merchandise by volume during the POI, Commerce found that "Red
Garden's margins are relevant for purposes of corroboration of a
margin based on information from the Petition" because "Red
Garden produced merchandise under consideration using all
[factors of production ("FOPs")] described in the Petition and
under the same production standards as the Petition." AR5 2d
Remand Results at 6; see also AR4 Remand Results at 33-34
(same).

[47] [[    ]] percent. See Attach. 1 to AR4 Remand Results
(Business Proprietary Mem. for Red Garden, A-570-893, ARP 08-09
(Sept. 26, 2013), ("Red Garden BPI Mem.")), Ct. No. 10-00275,
ECF No. 78-1, at 2; Attach. I to AR5 2d Remand Results,
Ct. No. 11-00335, ECF No. 107-1 (same).

resulted in margins which exceeded 112.81 percent." AR5 2d

Remand Results at 7; AR4 Remand Results at 34.[48]

        Based on these findings, Commerce concluded that "the

Petition rate continues to be relevant to this investigation,

even after taking into account subsequent changes to the

original calculations pursuant to remand redetermination, and

the rate to be corroborated [in] this [proceeding]." Id.

Accordingly, finding "no other information that would call into

question the reliability of that [Petition-based] rate," AR5 2d

Remand Results at 14; AR4 Remand Results at 41,[49] Commerce

concluded that "the commercial reality" – i.e., that a

significant quantity and value of CONNUMs were sold by a

---

[48] Specifically, Commerce found that CONNUMs accounting for
[[        ]]kg of subject merchandise were sold at prices that
resulted in margins exceeding 112.81 percent. Red Garden BPI
Mem. at 2.  In concluding that this amount accounted for a
significant volume of merchandise under consideration, Commerce
noted that a total sales volume reflecting this amount "would
have ranked Red Garden ahead of [[  ]] other companies at the
respondent selection phase of this investigation." Id.;
see also LTFV Final Results, 69 Fed. Reg. at 70,998 (referring
to a total of 58 respondents in the LTFV investigation – four
mandatory respondents, 53 respondents who requested a separate
rate, and the composite PRC-wide entity).

[49] Commerce also noted that Hilltop, who objects to the agency's
corroboration analysis in the AR5 2d Remand Results and the AR4
Remand Results (as discussed below) has offered no new credible
information that would rebut the presumption that a reliable
rate from a prior segment retains its reliability in subsequent
segments, absent rebutting evidence. Id.; cf. KYD, 607 F.3d
at 767 (discussing this presumption).

cooperating separate rate respondent at prices that resulted in

antidumping margins exceeding 112.81 percent – confirmed "the

continued reliability of the 112.81 percent rate and relevance

to the PRC-wide entity as a whole." Id.[50]  On the basis of this

analysis, Commerce concluded that the 112.81 percent PRC-wide

rate "has probative value." AR5 2d Remand Results at 7;

AR4 Remand Results at 34; cf. SAA at 870 (linking

"corroboration" to an evaluation of "probative value").

    *C. Discussion*

       Hilltop challenges Commerce's corroboration of the

112.81 percent PRC-wide rate assigned to it in the fourth and

fifth reviews.[51]  Specifically, Hilltop challenges the

---

[50] See Ad Hoc II, __ CIT __, 925 F. Supp. 2d at 1325 ("Commerce
correctly posits that the PRC-wide rate need not be corroborated
with respect to each particular respondent who, like Hilltop, is
found to form a part of the PRC-wide entity and thus to be
subject to the PRC-wide rate.") (citing Peer Bearing Co. –
Changshan v. United States, 32 CIT 1307, 1313, 587 F. Supp. 2d
1319, 1327 (2008) ("[T]here is no requirement that the PRC-wide
entity rate . . . relate specifically to the individual company.
. . . [This] rate must be corroborated according to its
reliability and relevance to the countrywide entity as a
whole.") (citation omitted); Shandong Mach. Imp. & Exp. Co. v.
United States, 33 CIT 810, 816 (2009) (not reported in the
Federal Supplement) (explaining that Commerce has no obligation
to corroborate the PRC-wide rate as to an individual party where
that party has failed to qualify for a separate rate)).

[51] Hilltop's AR4 Br. at 47-55; Hilltop's AR5 Br. at 3-12.  The
like domestic industry's party to this proceeding – the Ad Hoc
Shrimp Trade Action Committee – does not object to the agency's
corroboration analysis. See, e.g., [AHSTAC]'s Reply to Comments
on Final Results of Determination Pursuant to Court Remand, Ct.
                            (footnote continued)

methodology Commerce employed to corroborate the country-wide

rate, arguing that 1) Commerce's reliance on sales data from a

single respondent, without comparing such data to the documented

pricing behavior of other respondents, was unreasonable[52];

2) Commerce's reliance on a single respondent's subset of

CONNUM-specific margins (those at or exceeding 112.81 percent)

unreasonably cherry picks only those transactions that support

an affirmative corroboration, while ignoring the remaining

transactions that do not[53]; and 3) Commerce's reliance on data

from the LTFV investigation to corroborate the countrywide rate

applied in the fourth and fifth administrative reviews

unreasonably presumes that pricing data from the LTFV

investigation remain probative with respect to the later review

---

No. 11-00335, ECF No. 118, at 4-19 (arguing in support of
Commerce's corroboration analysis).

[52] See Hilltop's AR4 Br. at 49 (emphasizing the documented
pricing behavior of cooperative separate rate respondents
throughout the history of this antidumping duty order);
Hilltop's AR5 Br. at 6 (same); see also Hilltop's AR4 Br. at 51
(arguing that Commerce should have compared Red Garden's data to
"additional margin data from other respondents"); Hilltop's
AR5 Br. at 8 (same).

[53] See Hilltop's AR4 Br. at 49-50 (arguing that the quantity,
value, and volume of POI sales made at or exceeding a
112.81 percent dumping margin were not sufficiently significant
to support an inference of commercial reality for the
countrywide entity); Hilltop's AR5 Br. at 6-7 (same). Cf. *supra*
note 48 (discussing the volume of subject merchandise sold by
Red Garden at or exceeding a 112.81 percent dumping margin).

periods.[54]

> ### 1. Commerce's Decision to Rely Solely on Red Garden's Data

As explained above, Commerce examined all CONNUM-
specific margins calculated for the largest exporter of subject
merchandise by volume during the POI.  These CONNUM-specific
margin calculations do not suffer from the defects previously
identified by the court with regard to the comparison data
initially used by the agency to corroborate the countrywide rate
in the LTFV investigation and in every segment of this
antidumping proceeding thereafter.[55]  Hilltop argues that
Commerce unreasonably looked solely at Red Garden's data,
without comparing such data to the pricing behavior of other
respondents.[56]  In response, Commerce argues that the analysis it
employed to corroborate the probative value of the lowest
Petition-based rate for the PRC-wide entity "was the same well-
established methodology employed in the original investigation
and many other proceedings." AR5 2d Remand Results at 13;
AR4 Remand Results at 40.[57]

---

[54] See Hilltop's AR4 Br. at 48; Hilltop's AR5 Br. at 5.

[55] See Ad Hoc II, __ CIT __, 925 F. Supp. 2d at 1326.

[56] See Hilltop's AR4 Br. at 51; Hilltop's AR5 Br. at 8.

[57] See also AR5 2d Remand Results at 4-5 (describing the
identical methodology initially used to corroborate the
countrywide Petition-based rate in the LTFV investigation,
                                    (footnote continued)

To "corroborate" "secondary information" (including, as here, information derived from the Petition), Commerce must satisfy itself that the information has "probative value." See SAA at 870. The corroboration requirement ensures that antidumping duty rates calculated for non-cooperative respondents present "a reasonably accurate estimate of the respondent's actual [dumping] rate, albeit with some built-in increase intended as a deterrent to non-compliance."[58] In particular, while "the statute explicitly allows for use of the 'the petition' to determine relevant facts when a respondent does not cooperate," De Cecco, 216 F.3d at 1032 (quoting 19 U.S.C. § 1677e(b)), "Commerce may not use the petition rate to establish the dumping margin when its own investigation reveal[s] that the petition rate was not credible." Gallant, 602 F.3d at 1323 (relying on De Cecco, 216 F.3d at 1033).

In reviewing the results of LTFV investigations involving merchandise from market economies, for example, the courts have rejected Commerce's use of the petition rate for

---

although the agency initially used data from a different respondent, who at the time had been (erroneously) deemed to be the largest exporter by volume, see id. at 6 n.22); AR4 Remand Results at 31-32 (same).

[58] Gallant Ocean (Thailand) Co. v. United States, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (quoting F.lli De Cecco Di Filippo Fara S. Martino, S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000)).

non-cooperating respondents when the dumping margins actually

calculated for similarly-situated cooperating respondents are

much lower than the margins alleged in the petition.[59]  But where

(as here) the non-cooperating respondent is a NME countrywide

entity – definitionally presumed to set prices without regard to

market conditions[60] – the actual pricing behavior of the

cooperative respondents that have demonstrated eligibility for a

separate rate (precisely because they have differentiated

themselves from the countrywide entity) does not bear upon the

credibility of dumping allegations against the NME countrywide

entity in the way that the pricing behavior of cooperative

market economy respondents reflects on the credibility of

dumping allegations against their similarly-situated market

---

[59] See Gallant, 602 F.3d at 1323-24 ("Commerce calculated the
[57.64 percent non-cooperative respondent's] rate based on the
highest dumping margin alleged in the petition.  The fact that
Commerce ultimately imposed dumping margins between 5.91 percent
and 6.82 percent for the same products after its initial
investigation shows the possession of better information and
shows that the adjusted petition rate was aberrational.");
De Cecco, 216 F.3d at 1032-34 (affirming the Court of
International Trade's holding that Commerce may not rely on a
46.67 percent petition-based rate for a non-cooperating
respondent because Commerce's investigation had ultimately
resulted in dumping margins ranging from 0.67 percent to 2.80
percent for similarly situated respondents).

[60] See 19 U.S.C. § 1677(18)(A) ("The term 'nonmarket economy
country' means any foreign country that [Commerce] determines
does not operate on market principles of cost or pricing
structures . . . .").

participants.  Simply put, the NME countrywide entity is, by
definition, not similarly-situated to the cooperative separate
rate respondents.[61]  For while the pricing behavior of the
cooperative respondents may be relevant to the commercial
reality of non-cooperating exporters from a *market* economy –
constrained as such exporters are by the market forces of
competition – no analog exists in the NME context, where the
countrywide government entity is presumed to act unimpeded by
such forces.  In the NME context, therefore, the inference that
the countrywide entity as a whole may be dumping at margins
significantly above the cooperating separate rate market
participants is not unreasonable.[62]

        Another critical aspect of the evidentiary record
presented here is that the countrywide rate at issue was not
only the rate applied to the PRC-wide entity in the initial LTFV
investigation, but has also been the rate applied to that entity
in at least five subsequent administrative reviews.  Cf. KYD,

---

[61] See, e.g., AR5 Prelim. Results, 76 Fed. Reg. at 8342 ("We
consider the influence that the government has been found to
have over the economy to warrant determining a rate for the
entity that is distinct from the rates found for companies that
have provided sufficient evidence to establish that they operate
freely with respect to their export activities.").

[62] Cf. Hilltop's AR4 Br. at 48-50 (comparing the countrywide rate
to rates calculated for cooperative separate rate respondents
throughout the history of this antidumping duty order);
Hilltop's AR5 Br. at 5-7 (same).

607 F.3d at 767 (distinguishing <u>Gallant</u> and, by analogy,
<u>De Cecco</u>, because "the presumption that a prior dumping margin
imposed against an exporter in an earlier administrative review
continues to be valid if the exporter fails to cooperate in a
subsequent review" was not at play in those cases).  As the
Court of Appeals for the Federal Circuit explained, "it [is]
reasonable for Commerce to conclude, given [a respondent's]
refusal to cooperate in the [subsequent] administrative review
[or, as here, in the next *five* such reviews], that [such
respondent] had not altered its past pricing practices and that
its previous rate is reflective of its current pricing
practices." <u>Id.</u> at 764 (internal quotation marks omitted).

     Here, as in <u>KYD</u>, the PRC-wide entity's failure to
cooperate in these reviews "deprived Commerce of the most direct
evidence of [the PRC-wide entity's] actual dumping margin."
<u>See</u> <u>KYD</u>, 607 F.3d at 767.  But also as in <u>KYD</u>, "Commerce was
able to fill that evidentiary gap by looking to high-volume
[CONNUM]-specific margins for [a] cooperative compan[y] that
were higher than and close to the [112.81] rate, from which
Commerce concluded that that [this] margin does not lie outside
the realm of actual selling practices." <u>Id.</u> (internal quotation
marks omitted).[63]  Commerce reasoned that if a significant

---

[63] <u>See</u> *supra* note 48 (discussing the volume of subject
                                        (footnote continued)

percentage of the largest cooperating respondent's sales, by
both quantity and volume, were sold at or above the 112.81
percent dumping rate, then it is reasonable to conclude "that a
non-responsive, or uncooperative, respondent could have made all
of its sales at the same rate." AR5 2d Remand Results at 14; AR4
Remand Results at 41.  This is a reasonable approach that, by
its terms, does not require any analysis of data beyond that of
the largest cooperative respondent.  Hilltop has not submitted
any data or analysis that refutes the inferences Commerce draws
from this data.  Accordingly, Commerce did not act unreasonably
when it determined to limit the data used in its corroboration
analysis to that contained in the Red Garden Margin File.[64]

> 2. Commerce's Determination that the Evidence
>    Sufficiently Corroborates the Countrywide Rate from
>    the LTFV Investigation

Next, Hilltop challenges Commerce's corroboration
methodology in so far as it relies on CONNUM-specific margins,
arguing that doing so permits the agency to cherry pick the

---

merchandise sold by Red Garden at or exceeding a 112.81 percent
dumping margin).

[64] Cf. KYD, 607 F.3d at 764-68 (affirming corroboration of 122.88
percent Petition-based rate, despite the low margins (ranging
from 0.80 percent to 1.87 percent) calculated for other
respondents, because that rate was supported by 1) evidence
submitted with the petition; 2) high-volume transaction-specific
margins for cooperative companies at or above that rate; and
3) "the presumption that an exporter's prior margin continues to
be valid if the exporter fails to cooperate in a subsequent
proceeding").

transactions that support affirmative corroboration, while

ignoring those that do not. But as Commerce explains, "CONNUM-

specific [i.e., model-specific] margins result in calculated

margins that represent the pricing behavior related to groups of

sales, rather than individual sales, and, consequently, do not

result from cherry picking of individual transactions." AR5 2d

Remand Results at 13; AR4 Remand Results at 40.[65]  Moreover, the

percentage of Red Garden's sales made at prices resulting in

dumping margins at or exceeding 112.81 percent covered a volume

of subject merchandise sufficiently significant to support a

reasonable inference that this rate is probative of the non-

cooperating countrywide entity's actual pricing behavior.[66]

> 3. Commerce's Determination that the LTFV
>    Investigation's Countrywide Rate Remains Probative
>    for the Fourth and Fifth Reviews

Finally, Hilltop argues that Commerce's corroboration

analysis is flawed because it relies on data from the LTFV

investigation to corroborate a rate applied in later review

periods. But Hilltop ignores judicial precedent holding that

the continued reliability and relevance of data from prior

segments of an antidumping proceeding is presumed absent

---

[65] See also *supra* note 43 (explaining CONNUM-specific margins).

[66] See *supra* note 48 (discussing the volume of subject
merchandise sold by Red Garden at or exceeding a 112.81 percent
dumping margin).

rebutting evidence. <u>KYD</u>, 607 F.3d at 764-68 (discussing cases).

       The rate applied to the PRC-wide entity throughout the
history of this antidumping duty order was calculated in the
underlying LTFV investigation.[67]  It was the lowest of a range of
rates calculated using information derived from the Petition.[68]
To satisfy itself that this rate had probative value regarding
the non-cooperating PRC-entity's actual pricing behavior,
Commerce evaluated the supporting evidence and also compared
this rate to the model-specific dumping margins calculated for a
cooperating respondent who produced its merchandise using all of
the same factors of production and under the same production
standards as the Petition.[69]  Based on this analysis, Commerce
concluded that, because a significant percentage of the quantity
and value of this cooperating respondent's sales represented
prices at or above the lowest Petition dumping margin of 112.81

---

[67] <u>See</u> <u>Certain Frozen and Canned Warmwater Shrimp from the</u>
<u>People's Republic of China</u>, 69 Fed. Reg. 70,997, 71,003 (Dep't
Commerce Dec. 8, 2004) (notice of final determination of sales
at less than fair value) ("<u>LTFV Final Results</u>") (assigning
112.81 percent as the PRC-wide rate).

[68] <u>Certain Frozen and Canned Warmwater Shrimp from the People's</u>
<u>Republic of China</u>, 69 Fed. Reg. 42,654, 42,662 (Dep't Commerce
July 16, 2004) (notice of preliminary determination of sales at
less than fair value) (unchanged in the final determination,
69 Fed. Reg. at 71,003).

[69] <u>See, e.g.</u>, <u>AR4 Remand Results</u> at 31-32 (describing the initial
corroboration of the PRC-wide rate during the LTFV
investigation).

percent, that margin had probative value regarding the likely
pricing behavior of the non-cooperating PRC-wide entity as a
whole.  Now, having revisited its calculations to implement the
outcome of judicial review, Commerce continues to draw the same
reasonable conclusions from the (revised) evidence.[70]

        Hilltop has presented no new evidence to suggest that
the Petition-based countrywide rate, as corroborated using
(appropriately recalculated) contemporaneous data from the
largest cooperating respondent during the POI, has lost its
probative value. See AR5 Remand Results at 14 (citing KYD, 607
F.3d at 767); AR4 Remand Results at 41 (same); see also SAA
at 870 (linking "corroboration" to "probative value").  While
Commerce has assigned this rate to the PRC-wide entity
throughout the entire history of this antidumping duty order –
including in three prior reviews before the two reviews now at
issue – neither the PRC-wide entity nor any other respondent has
come forward with any more accurate information.  Accordingly,
in addition to corroborating the probative value of this rate by
examining the evidence submitted along with the Petition from
which it is derived and the pricing behavior of the largest
cooperating exporter during the POI, Commerce reasonably
inferred that the PRC-wide margin assigned in the prior segments

---

[70] See supra notes 46-48.

of this antidumping proceeding "is the most probative evidence

of current margins because, if it were not so, the importer,

knowing of the rule, would have produced *current* information

showing the margin to be less." <u>KYD</u>, 607 F.3d at 766 (emphasis

in original) (internal quotation marks and citation omitted).[71]

## CONCLUSION

For all of the foregoing reasons, Commerce's <u>AR5 2d

Remand Results</u> and the <u>AR4 Remand Results</u> are each sustained.

Judgments will issue accordingly.

                                    /s/ Donald C. Pogue
                                    Donald C. Pogue, Chief Judge

Dated: May 20, 2014
       New York, NY

---

[71] <u>See also</u> *supra* note 64 (noting the similarity of this case to
the facts in <u>KYD</u>).